JACKSON CITY BANK & TRUST CO. *v.* TOWNLEY.

1. WILLS—MENTAL COMPETENCY—EVIDENCE.

Evidence *held*, insufficient to raise an issue of fact as to mental competency of testatrix to make will disposing of large estate in which mention but no property provision was made for her youngest son with whom she had quarreled, where no unskilful business transaction was recounted in her management of a large farm, alone instructed her attorney how and why to make such disposition of her property, contestant had made a contract with her relative to share in his father's estate and doctor who had treated her said she was mentally abnormal but did not say she was incompetent; although she was a queer, jealous, melancholic and, often, despondent person.

2. SAME—UNDUE INFLUENCE.

Record *held*, barren of evidence that brother exercised undue influence upon his mother, the testatrix, in eliminating contestant as an object of her bounty, where evidence demonstrates her feeling toward contestant was personal, deepseated and of long standing and before brother became her adviser.

3. SAME—WILFUL SLANDER—INSANE DELUSIONS.

Wilful slander is not such an insane delusion as will defeat probation of a will.

4. SAME—INSANE DELUSIONS—BURDEN OF PROOF.

Contestant who seeks to defeat a will on ground of insane delusions of testatrix has burden of proving that she believed her statements, had no reasonable information or evidence supporting them and would not have disinherited him but for such belief.

5. SAME—INSANE DELUSIONS—EVIDENCE.

Will may not be set aside as made by testatrix harboring an insane delusion as to the morality of mother-in-law and wife of contestant son, where he fails to show information or evidence upon which testatrix believed charge of immorality, if she believed it, and there was no testimony connecting it with will.

6. SAME—INSANE DELUSIONS—EVIDENCE—PERSONAL CONFLICT.

Charges of testatrix made by her as a result of impressions received from personal conflict and controversy with contestant may not be held as insane delusions by a jury without knowing all the facts as they appeared to her and, not then, if there was basis for the impressions however exaggerated they may be.

7. SAME—BITTER FEELING—FAMILY CONFLICT—INSANE DELUSIONS.

Testimony *held*, conclusive that statements of testatrix and her bitterness of feeling toward contestant arose out of long-continued family conflict and that will, omitting property provision from large estate to contestant son, was result of such feeling and not of an insane delusion.

8. SAME—DIRECTED VERDICT.

Verdict *held*, properly directed for proponents where contestant failed to show any evidence of mental incompetency or undue influence and failed to sustain burden of proof that will was result of insane delusions.

Appeal from Jackson; Williams (Benjamin), J. Submitted June 13, 1934. (Docket No. 12, Calendar No. 37,471.) Decided September 18, 1934. Rehearing denied December 11, 1934.

Jackson City Bank & Trust Company presented for probate the will of Nettie H. Townley, deceased. Over objections of Fay V. Townley, the will was admitted to probate. Contestant appealed to circuit court. Directed verdict and judgment for proponent. Contestant appeals. Affirmed.

*Richard Price* and *Birney E. Brower,* for appellant.

*Whiting, Kleinstiver & Aubrey* and *Bisbee, Mc-Kone, Wilson & King,* for appellee.

FEAD, J. Contestant reviews judgment, on direction of verdict, allowing the will of his mother, Nettie Townley, against his claims of (a) her mental incompetency, (b) undue influence of his brother Neal, and (c) her insane delusions.

Montgomery and Nettie Townley, first cousins, were married in Arkansas, where their three sons, Richard (42), Neal (37), and Fay (36) were born. In 1906 they returned to Michigan, built a home in the city of Jackson, later acquired large contiguous farms formerly owned by their fathers some 14 miles from Jackson, built a home and lived on the farm for the rest of their lives. They took title by the entireties.

Richard married in 1909, later went west, where he has since lived. His wife divorced him and he remarried. Neal, except while in the world war service, has been connected with the Walcott Lathe Company in Jackson. Fay conducted his parents' farm from 1917 to 1921, then acquired a ranch in Colorado, and has since engaged in different sorts of labor.

Montgomery Townley died in April, 1923, leaving an estate appraised at $361,000, but with losses of $135,000 accruing during administration. He had properties in Missouri, large stockholdings in the Walcott Lathe Company, other corporate shares and real and personal property. Claims of $405,000 were allowed against the estate, principally on his indorsement of obligations of the Lathe Company. In his will be gave Richard and Neal each a parcel of land, Richard the Missouri property, Neal the Lathe Company stock, Fay the life income of a trust fund of $5,000, a grandchild a similar trust income, Nettie $100,000 and some personal property and life income in the residue, with remainder to charities.

Fay was dissatisfied with the will, threatened contest, and in a few days his mother paid him $1,000, engaged in writing to pay him $26,000, and took an assignment of his legacy. She made various payments to him on the contract. In 1925 she was in

default. The claims against her husband's estate had not been settled. She did not know how much could be salvaged for her. Fay brought suit against her on the contract and moved for summary judgment. The matter was settled by Nettie conveying to Fay a farm at $15,000 and paying him cash of $8,000 or $9,000.

Nettie died in July, 1931, leaving a will executed in 1928. Her estate inventoried $158,000. She gave a grandniece $1,000, Neal a 480-acre farm and certain personal property appraised at about $38,000, and divided the residue in trust equally between Richard and Neal, each to have income for life, with principal to his heirs. As to Fay she provided:

"Sixth. In making and executing this my last will, I am not unmindful of my son, Fay V. Townley. Inasmuch, however, as by written contract, entered into with him on the 16th day of April, 1923, I among other things, obligated myself for the payment to him of $26,000 (which obligation I have since met), I do not, for such and other reasons, which, to my mind, abundantly justify my action, feel called upon to make provision for him in this my last will."

The scrivener testified that testatrix said Fay had abused her verbally.

Mrs. Townley was queer. She worshipped her husband. She became jealous at his slightest attention to another woman, even a daughter-in-law. She was melancholy, often despondent, cried frequently, threatened suicide but never attempted it, and sometimes shunned callers and friends. Fay said both his parents were accustomed to charge virtuous girls with immoral conduct and he had remonstrated with them often about it. Testatrix told folks that Fay's wife, Grace, had to get married and had induced an abortion. She made similar statements

.regarding other daughters-in-law. A doctor, who thought her sane when he treated her, expressed an opinion on hypothetical question that she was "mentally abnormal." But he did not say she did not have competency to make a will under the legal test. Nor did incidents related by other witnesses so tend. Fay did not question her capacity to contract, be sued or make a settlement; she managed a large farm, with advice from Neal, and no unskilful business transaction was recounted; alone she instructed her attorney to draft her will, told him how, and gave reasons for the disposition of her property. The testimony did not raise an issue of fact as to her mental competency. *In re Walkey's Estate,* 249 Mich. 653; *In re Aylward's Estate,* 243 Mich. 9.

The record is barren of evidence that Neal dominated his mother or attempted to influence the disposition of her property. As late as 1927 he tried to reconcile his mother and Fay. The evidence demonstrates that testatrix's feeling toward Fay was personal, deep-seated and of long standing, dating from before her husband's death and before Neal became her adviser.

The insane delusions claimed are that testatrix believed (a) Fay had abused her and called her a liar, (b) he had tried to kill her and poison her, (c) he had tried to kill his father, (d) Fay's wife, Grace, was immoral and unworthy and her mother conducted a lewd resort. These claims must be viewed against the background of the relations of the parties.

In 1917, when Neal went to war, Fay was induced by his parents to remain at home and conduct the farm on salary and profit, his father to make necessary advancements of money. When Fay began courting Grace in 1918 and became engaged to her

in September, his parents were pleased. They often invited her to the farm. Grace's mother opposed the marriage because Mr. and Mrs. Townley were first cousins. In November, when Mr. Townley was bringing Grace to the farm for a surprise visit, his car ran off the road and he was delayed beyond his usual time, testatrix's attitude toward Grace changed. It is said she became jealous. At all events, she opposed the marriage. Fay and Grace were married at a neighbor's home in January, with no parent present.

They went at once to the farm and lived with Fay's parents for three months. They then moved to a bungalow on the farm. Trouble arose. Fay and Grace put all blame on testatrix. They do not give the details but the trouble evidently was serious because it resulted in quarrels which sent Grace home to her mother several times; and in August, 1919, Mr. Townley offered Fay $100,000 if he would desert Grace and go west.

Fay and Grace remained on the farm until 1921. To Fay as well as others Mrs. Townley said Grace's mother conducted a bawdy house. She told Fay that Grace would kill him for his life insurance. Mr. Townley gave Fay a new car but with injunction that Grace should not drive it. The prohibition was withdrawn when Fay refused to accept the car on that condition. Fay claims he overpaid his father on settlement of advances in 1920 and his salary was discontinued. Early in 1921 testatrix received a party invitation which included both Grace and Neal's wife. She promised to take them. She did not come for Grace. Fay took her to task for it. She said Grace was not included in the invitation. Fay testified he told her she was mistaken. There was no ground for mistake and she evidently understood him to use the stronger term,

because, as he was about to leave, his father and brother upbraided him and referred to Grace in degrading terms.

At once after this incident Fay prepared to leave the farm. He wanted to conduct an auction sale. There was controversy as to the property belonging to him. Through the ministrations of Mr. Townley's attorney, whom Fay consulted, an agreement was reached that certain property should be left there until fall. Further trouble occurred in the fall.

Shortly afterward, Mr. Townley advised Fay to go west. He helped him finance the purchase of a ranch in Colorado. His estate later paid the loan. Mr. Townley cautioned Fay to conceal from testatrix the fact he was aiding him. Thereafter Fay spent his summers in Colorado for some years, returning to Michigan in the winter and working at various jobs. At times his mother was cordial to him and at other times unfriendly. When the father died, Fay's mother took occasion to tell him that she thought his practical disinheritance by his father was deserved by him. After they entered into the contract their relations were not cordial except on a few occasions. In 1927, shortly before the will was executed, when Fay, at Neal's suggestion, attempted a reconciliation with his mother, she stated that while she might forgive what he had done to her, she could not forgive what he had done to his father.

The tests of an insane delusion are set up in *Re Barlum's Estate,* 240 Mich. 393. To defeat a will on this ground it is not enough to show that testator has made false accusations. Wilful slander is not a delusion. Contestant had the burden of proving that testatrix believed her statements, she had no reasonable information or evidence support-

ing them and, but for such belief, she would not have disinherited him.

Testatrix's charge that Grace and her mother were immoral may have been a vicious statement arising from the habit of speaking evil of women or from dislike of Grace. In any event, contestant failed to show the information or evidence upon which testatrix believed the charge, if she believed it, and there was no testimony connecting it with the will.

Testatrix's charge that Fay wanted to kill her was a casual remark, made while the lawsuit was pending and she was complaining of him, and in connection with an incident where testatrix and a companion were almost struck by a car. There was no indication that she seriously believed it then or thereafter. If she did, it obviously was a conclusion from years of controversy. The incident as to poison occurred when Fay gave his mother a box of candy. After it had been eaten, an employee suggested it might have been poisoned. Testatrix merely told what the employee had said. Any delusion about it was his, not hers.

Testatrix's charge that Fay did not love her was a conclusion from his conduct. She may have been mistaken. But, aside from the general quarrels, his suit against her when she was anxious about her finances furnishes reason for the feeling.

The charges which appear to have directly influenced the will are that Fay had abused testatrix and had tried to kill his father. Testatrix made these charges as an eye-witness and of her own knowledge. The record shows many controversies between Fay and his parents. It is not for a jury to appraise the impressions which a testator receives from personal conflict and controversy and hold them insane delusions, without knowing all the

facts as they appeared to the testator and, not then, if there was basis for the impressions however exaggerated they may be.

The testimony is conclusive that all the conclusions of testatrix, her bitterness of feeling toward Fay and her charges against him arose out of family conflict and controversy. The will was the result of such feeling and not of an insane delusion.

We think the court properly directed the verdict and the judgment is affirmed, with costs.

NELSON SHARPE, C. J., and POTTER, NORTH, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.