*In re* COTCHER'S ESTATE.

APPEAL OF UNION NATIONAL BANK.

1. WILLS—UNDUE INFLUENCE—BURDEN OF PROOF.

One alleging procurement of will through undue influence must prove that improper influence was exerted and that it had the effect of overcoming the will of testatrix.

2. SAME—UNDUE INFLUENCE—FIDUCIARIES—PRIEST—PRESUMPTIONS.

Presumption that devise of property to one in such confidential and fiduciary relationship as a priest was procured through undue influence is rebuttable.

3. EVIDENCE—PRESUMPTIONS—WEIGHT AGAINST EVIDENCE.

A rebuttable or *prima-facie* presumption has no weight as evidence; it may establish a *prima facie* case, but, if challenged by rebutting evidence, the presumption cannot be weighed against the evidence, and upon introduction of supporting evidence, the actual evidence introduced is then weighed without giving any evidential force to the presumption itself.

4. WILLS—UNDUE INFLUENCE.

While some influence may be exerted upon testator in the making of his will, it is not undue influence except when testator's will is overcome.

5. SAME—UNDUE INFLUENCE—MERE OPPORTUNITY.

Undue influence cannot be established by proof of opportunity alone.

6. SAME — UNDUE INFLUENCE — EVIDENCE — RELIGIOUS SOCIETIES — CHARITIES.

Evidence that testatrix in attending church and along with other parishioners, but not individually, was urged and solicited to support the church and its charities *held,* insufficient to take issue of undue influence to jury in the absence of testimony that the will resulted from such influences rather than from the exercise of her own mind.

7. SAME—UNDUE INFLUENCE—EVIDENCE—ATTORNEY AND CLIENT—WITNESSES.

Presumption that testatrix was subjected to undue influence does not arise from fact that attorney who drew her will and subscribing witnesses thereto were of same religious faith as church and charities to which bulk of estate was left.

8. SAME—MENTAL COMPETENCY—FAILING EYESIGHT—EVIDENCE.

That 80-year old testatrix mistook door for window, failed to recognize familiar places, articles of food and wearing apparel *held*, not evidence of mental incompetency to make will in view of her failing eyesight.

9. SAME—MENTAL COMPETENCY—FORGETFULNESS.

Evidence of forgetfulness on part of 80-year old testatrix as to relatives, acquaintances and name of a certain school *held*, not to warrant finding that she was mentally incompetent to make will.

10. SAME—ABILITY TO EXERT MIND.

Weakness of mind and forgetfulness are not sufficient to invalidate a will if it appears that the testatrix's mind was capable of attention and exertion when aroused, and was not imposed upon.

11. SAME—ECCENTRICITY.

Eccentricity, unless it takes the form of monomania, will not incapacitate a person from making a will of his or her property.

12. SAME—IMPAIRMENT OF MIND—CONNECTED CONVERSATION.

Evidence of some loss or impairment of mind does not of itself present a question for jury of mental incompetency on part of 80-year old testatrix; nor does an inability to carry through a connected conversation present such a question.

13. SAME—MENTAL COMPETENCY—EVIDENCE.

In will contest, evidence that 80-year old testatrix had some arteriosclerosis *held*, insufficient to overcome abundance of proof of her mental competency to execute will which was not unreasonable in any of its provisions and she had no particular reason for leaving anything to her brother and no more than she did leave to her grandnieces and nephew, contestants.

14. JUDGMENT — VERDICTS AND FINDINGS — SPECIAL QUESTIONS — WILLS.

In will contest where court should have directed verdict for proponents at close of contestants' case on ground that evidence did not present a jury question as to undue influence or mental competency, verdict for contestants on special questions covering such matters submitted by court *sua sponte held*, not controlling, hence judgment for proponents *non obstante veredicto* was properly entered.

Appeal from Marquette; Bell (Frank A.), J. Submitted October 16, 1935. (Docket No. 53, Calendar No. 38,159.) Decided January 6, 1936.

Edward S. Bice presented the will of Hannah Cotcher for probate. William O'Meara objected thereto. From order allowing will, contestant appealed to circuit court. Suggestion of death of contestant William O'Meara, and Union National Bank and Ernest L. Pearce, administrator and trustees of the estate of William O'Meara, substituted as contestants. Frances Read, Olive Stark and Percy O'Meara also substituted as contestants. General verdict and answers to special questions for contestants. Judgment for proponents *non obstante veredicto*. Contestants appeal. Affirmed.

*M. J. Kennedy,* for contestants.

*Miller, Eldredge & Eldredge,* for proponents.

Edward M. Sharpe, J. This is an appeal from the judgment of the circuit court for the proponents of the will of Hannah Cotcher *non obstante veredicto.*

The testatrix died in Marquette July 17, 1932, a childless widow; the relatives who survived her are one brother William O'Meara, and the three children of her deceased nephew, John O'Meara, whose names are Percy O'Meara, Frances Read, and Olive Stark. The will in question was dated October 11, 1930, and directs her executor to cause her body to be interred in Park Cemetery, Marquette, beside that of her deceased husband. It also directs the expenditure of $1,000 for masses for the repose of her soul; and provides a legacy of $500 each for the

children of her deceased nephew John O'Meara, and that one-third of the residue is to go to the Holy Family Orphanage Home of Marquette and the remaining two-thirds is to go to the then pastor of St. Peter's Cathedral, Marquette, to be expended for the use and benefit of the Baraga Parochial School of Marquette. The value of the estate is approximately $27,000.

The testatrix came to this country from Ireland as a girl and in her early years was a Roman Catholic. During the year 1904 or 1905 she married Mr. Cotcher who was of the Prostestant faith and who died in 1925. During her married life she went to church rarely, if at all; but after the death of her husband, she again resumed her early religious beliefs and became to all intents and purposes a practical Catholic. With the aid of her husband she accumulated considerable real estate, but upon his death began to dispose of it and invest the proceeds in bonds. She made three wills, the first of which was made in 1925 and shortly after her husband's death. The second will was made May 26, 1926, while the third will, and the one in question, was made October 11, 1930. Each of the wills makes the same provisions for the children of her nephew John O'Meara. The last will was prepared by Mr. John J. Walsh who, at the time of the execution of the will, had been acting as attorney for the bishop of the Roman Catholic church and was a member of a Catholic church. At the time the last will was executed, testatrix was living in an apartment rented from Mrs. Berry who was one of the subscribing witnesses to the will. She stayed in this apartment from about September, 1929, until May, 1931, when she went to the hospital. She had previously arranged with the hospital authorities for

her board and care for the rest of her natural life for which she paid $3,000.

When the cause came on for trial the following special questions were submitted to the jury:

"Was Hannah Cotcher a free agent in planning and executing the instrument in question so that it was her will, and not the result of the influence of another or others?

"Was Hannah Cotcher at the time this will was made mentally competent to plan and execute the instrument in question as her last will?"

The jury answered both questions in the negative and brought in a verdict against the will. The trial court later entered judgment for the proponents, from which judgment contestants appeal.

It is first contended by contestants that the relationship between Rev. Buchholz and testatrix was confidential and fiduciary in its nature and as such gave rise to the presumption of undue influence. The record discloses that Rev. Buchholz came to Marquette in 1915 and first became acquainted with testatrix in 1925. In the summer of 1929, Rev. Buchholz saw testatrix at her home in Mrs. Berry's flat and talked to her about getting into a home. He preached to the members of his church and advised that it would be wise to make provision for themselves after death; this included provisions for masses and donations to the church or its institutions. The doctrine of the Catholic church is that the performance of masses after death will assist in bringing the soul out of purgatory, and that by donations to the church people may satisfy for the souls of those who have gone. There appears to be no dispute over the fact that Father Buchholz did nothing directly to influence testatrix. He never discussed the subject of a will or the disposition of

testatrix's property with her and did not know of
the bequests in the will of 1930 until he was so noti-
fied by the probate court.

In order to establish undue influence contestants
must prove that improper influence was exerted and
that it had the effect of overcoming the will of tes-
tatrix. *In re Spinner's Estate,* 248 Mich. 263. While
there is a presumption of undue influence where a
person devises property to one in such a confidential
and fiduciary relationship as a priest, *In re Brom-
ley's Estate,* 113 Mich. 53, yet it is a rebuttable one.
We said in *Gillett* v. *Michigan United Traction Co.,*
205 Mich. 410,

"It is now quite generally held by the courts that
a rebuttable or *prima facie* presumption has no
weight as evidence. It serves to establish a *prima
facie* case, but if challenged by rebutting evidence,
the presumption cannot be weighed against the evi-
dence. Supporting evidence must be introduced, and
it then becomes a question of weighing the actual
evidence introduced, without giving any evidential
force to the presumption itself."

We have held that some influence may properly be
used and that only when the testator's will is over-
come is the result invalid. *In re Spinner's Estate,
supra; Schneider* v. *Vosburgh,* 143 Mich. 476. Nor
can undue influence be established by proof of oppor-
tunity alone. *In re Murray's Estate,* 219 Mich. 70.

It is urged that Mrs. Cotcher, in attending church,
was urged and solicited to support the church and
its charities, but we do not find that the solicitations
were individual; rather they were made to all pa-
rishioners alike.

In *Re Saunders Estate,* 235 Mich. 342, we said:

"But there is no evidence that she had such extra-
ordinary confidence in such communications, whether

received through a medium or directly, as she believed, that she was impelled to follow them blindly, that her free agency was destroyed, that the will resulted from such influences rather than from the exercise of her own mind, that it was not her will. * * * The trial judge was right in holding that the evidence raised no question of fact for the jury.''

We agree with the trial court when he said:

''Such requests, pleadings and urgings are not wrong. 'There can be no fatally undue influence without a person incapable of protecting himself as well as a wrongdoer to be resisted.' (*Latham* v. *Udell,* 38 Mich. 238, 242.) This method of raising money for churches and charities prevails throughout all Christendom. There can be no inference of undue influence from its use alone.''

We cannot find that the urging of Father Buchholz went beyond the teachings of the church or that the will of testatrix was overcome by this doctrine; rather we find that when Mrs. Cotcher was urged to make certain gifts for religious purposes, she declined to do so. Nor does the fact that her lawyer and other subscribing witnesses were Roman Catholics raise any inference or presumption of undue influence.

Counsel for appellants contends that testatrix lacked the mental capacity to execute a will; and produced testimony tending to show that at times testatrix mistook a window for a door, that upon numerous occasions she failed to recognize familiar places, articles of food, wearing apparel. But in view of her failing eyesight, we think such actions may be attributed to her physical rather than her mental condition.

There is some evidence of forgetfulness on the part of Mrs. Cotcher, such as failing to remember

the nature of her grandnephew's occupation; the death of an acquaintance, the given names of her three grandnieces, or calling the Baraga Parochial School the Catholic Boys' School. Such failure of memory does not warrant the finding of testamentary incapacity. We said, in *Schneider* v. *Vosburgh, supra*:

"Weakness of mind and forgetfulness, therefore, are not sufficient to invalidate a will or deed, if it appears that the testator's or the grantor's mind was capable of attention and exertion when aroused, and was not imposed upon. * * * Eccentricity, unless it takes the form of monomania, will not incapacitate a man from making a will or a conveyance of his property."

It is to be expected that the mind of a person 80 years of age will not be as keen as in early youth, but evidence of some loss or impairment of mind does not of itself present a question of mental incompetence that should be submitted to a jury; nor does an inability to carry through a connected conversation present such a question. *In re Aylward's Estate,* 243 Mich. 9.

The testimony of Mrs. Cotcher's general physical condition shows that she had some arteriosclerosis in 1927 and a more advanced case in 1931, but we do not find that this disease produced mental symptoms at the time the last will was made, nor when attended by her physician more than a year after the execution of this will. The will is not unreasonable in any of its provisions; testatrix had no particular reasons for leaving to her heirs any more of her estate than she did and without going further into the testimony relating to her mental capacity we think proponents produced an abundance of testi-

mony to show that testatrix was mentally competent to execute the will in question.

During the trial of the cause and at the close of the testimony, counsel for proponents asked the court for a directed verdict in favor of the will. This motion was temporarily denied, the court stating that he was withholding disposition of the motion under the Empson act (3 Comp. Laws 1929, § 14531 *et seq.*). The court then submitted the two special questions to the jury without the same being requested by either counsel and the jury answered these questions in harmony with their general verdict. Counsel for contestants now contends that the trial court had no authority to set aside the special verdict.

At the close of the contestants' case, the trial court could have directed a verdict in favor of the proponents, and again at the close of all proof could have directed a verdict on the ground that there was no evidence that presented a jury question. In *King* v. *Bird,* 245 Mich. 93, we said, ''The finding of the jury had no effect upon the motion for judgment notwithstanding the verdict because the motion was made and must be considered on the situation as it existed before submission of the cause to the jury,'' consequently having submitted these special questions, we think the answers were immaterial and not controlling.

The trial court should have directed a verdict at the close of contestants' proof and the judgment *non obstante veredicto* is affirmed, with costs to proponents.

North, C. J., and Fead, Wiest, Butzel, Bushnell, and Potter, JJ., concurred.

The late Justice Nelson Sharpe took no part in this decision.