*In re* KAVEN'S ESTATE.

1. WILLS—INSANE DELUSION—EVIDENCE.

Childless testatrix who left all of her property to sister and niece and none to husband who had helped accumulate it *held*, to have made such disposition as result of insane delusion, consisting of unfounded and unjustified belief that husband, a physician and 10 years her junior, had sexual relations with other women and operated a hospital which she customarily spoke of as a place of ill repute.

2. SAME—INSANE DELUSION—DEFINITION.

An insane delusion exists when a person persistently believes supposed facts which have no real existence, and so believes such supposed facts against all evidence and probabilities and without any foundation or reason for the belief, and conducts himself *as if such facts actually existed.*

3. SAME—INSANE DELUSION—JUSTIFICATION—MERE OPPORTUNITY FOR IMMORAL CONDUCT ON PART OF SPOUSE IGNORED IN DISTRIBUTION.

Under record without testimony that husband of testatrix, an actively practising physician, ever had any illicit or unduly intimate relations with any of his female patients or employees, mere opportunities for immoral conduct arising from normal

professional practise *held,* insufficient to afford justification
for belief of testatrix that he was guilty of illicit relations,
which belief resulted in his total exclusion from sharing in her
estate under her will; mere opportunity for improper conduct
under such circumstances affording no more basis for justifica-
tion in such belief than mere opportunity to exercise undue
influence affords basis for finding that undue influence was
exercised.

Appeal from Tuscola; Cramton (Louis C.), J.
Submitted January 5, 1937. (Docket No. 18, Cal-
endar No. 39,220.) Decided April 15, 1937.

In the matter of the estate of Carrie Wright
Kaven, deceased. Henrietta Turner presented the
will of Carrie Wright Kaven for probate. Gottlieb
Henry Kaven filed objections thereto. From order
of probate court admitting will to probate, contest-
ant appealed to circuit court. Judgment for pro-
ponent. Contestant appeals. Reversed and re-
manded.

*Maurice C. Ransford,* for proponent.

*G. A. Kaven* (*Cook & Cook,* of counsel), for con-
testant.

NORTH, J. This is a will contest tried on appeal in
the circuit court without a jury. The court sustained
the will and contestant has appealed. Invalidity of
the will is asserted both on the ground that at the
time the will was made the testatrix was suffering
from an insane delusion which affected the terms of
her will and that the will was not executed in con-
formity with statutory requirements. (3 Comp.
Laws 1929, § 13482.)

The will was executed February 18, 1933. Mrs.
Kaven died August 22, 1933. The alleged insane de-
lusion consisted of an unfounded and unjustified be-

lief on the part of the testatrix that her husband, the contestant, had sexual relations with other women. For many years Dr. Kaven was a practising physician and the manager and operator of a hospital at Unionville, Michigan, wherein several beds were maintained for patients and usually two nurses were employed. Notwithstanding at the time of making the will and at the time of her death Mrs. Kaven was seized of a substantial estate (approximately $18,000, as disclosed by the inventory on file in this court) and that she had no children, she left nothing to her surviving husband, the contestant. As bearing on the issue of insane delusion, we quote a statement of facts from proponent's brief:

"Carrie Wright Kaven, the testatrix, was born about 1865 and was 68 years of age at the time of her death on August 22, 1933. Her first husband, Dr. Wright, died in November, 1902. From the estate of Dr. Wright she inherited a house and lot in Unionville worth $1,200, mortgages to the value of $5,000, insurance of $2,000. On December 28, 1909, she married Dr. Gottlieb H. Kaven, the contestant in the present case. Dr. Kaven was 33 years of age at the time of the marriage and Mrs. Kaven was 10 years older. At the time of the marriage it was agreed that the house and lot was to be owned by Dr. Kaven and subsequently title was made jointly to it with Dr. and Mrs. Kaven. Mrs. Kaven, at that time, also assigned four or five mortgages to Dr. Kaven amounting to about $5,000. Mrs. Kaven also deeded the so-called Forester lot to Dr. Kaven. * * * After the marriage Mrs. Kaven handled all of the cash, and transacted all of the business deals of loaning and collecting the money. This continued up to the time of her death. Mrs. Kaven had no children born in either of her marriages. * * * She had three living sisters. * * * Under the will the property was all left to her sister, Mrs. Henrietta Turner, of Caro, Michi-

gan, except one-half of the furniture, clothing, bedding and books to Mrs. Edith Tack, a niece. * * *

"The numerous facts as shown by witnesses for the appellant were as follows:

"That Mrs. Kaven suffered a malformation of her genitals which prevented her from having children. That she had unpleasant sexual relations with her first husband and with Dr. Kaven. That in the year 1912 Mrs. Kaven referred to Dr. Kaven's hospital as a whorehouse, and said she would call it that and didn't give a damn if she did hurt the business. She said, 'That is the way I look at it; it is chasing the girls all the time.' That also in 1912, Mrs. Kaven said if the doctor wouldn't spend so much time with other women he would have more time to spend in his own home; and when calling on women he took more time than was necessary, and sometimes saw women she didn't know anything about. From 1912 until 1933 statements of similar nature were made by Mrs. Kaven to strangers and friends. That the subject of her husband's infidelity was a continuous topic in the mind of Mrs. Kaven in her conversations with friends and some of the doctors who visited the home to see Dr. Kaven. * * * That one night in 1922, at 11 o'clock she got out of bed and went to the hospital and ordered Dr. Kaven to go home and that same night they quarreled because Mrs. Kaven accused the doctor of having an affair at the hospital with one of the nurses. That one night about the same time Mrs. Kaven got out of bed and went to the doctor's bedroom and cried, 'Where is she?' and searched about for a woman she suspected was with the doctor. Mrs. Kaven said she thought she heard the door open. One afternoon in 1922, Mrs. Kaven ran out of the house and ordered a nurse out of the doctor's automobile. In September, 1931, Mrs. Kaven saw a stranger in the street and told Dr. Kaven's niece that he was an old buck, and his wife must be leading a miserable life having to put up with that every day, every night. On another occa-

sion about the same time (September, 1931) while
Mrs. Kaven and her niece were at a farmer's home
to get apples, the farmer appeared after a few min-
utes' wait, Mrs. Kaven said, 'he had probably been
doing his family duty.' * * * In early April, 1933,
Mrs. Kaven flew into a rage and called Dr. Kaven
and his driver, Carl Schaar, many vile and obscene
names, and accused them with being out with the
whores at Bay City. That during the last eight
years (1925 to 1933) of the marriage of Dr. and Mrs.
Kaven that they did not sleep together. That many
times Mrs. Kaven peeked in windows, and drove
about the hospital with the apparent purpose of spy-
ing upon Dr. Kaven, and offered money to Carl
Schaar to spy upon Dr. Kaven."

A careful review of the testimony in this record
practically forces the conclusion that the testatrix
was suffering from an insane delusion; and that as
a result of such insane delusion she made a disposi-
tion of her property which is not otherwise subject
to a reasonable explanation or understanding. The
major portion, if not all, of the estate of which Mrs.
Kaven died seized unquestionably was the accumu-
lated earnings of her husband in the practise of his
profession and in the operation of his hospital. Be-
cause of Mrs. Kaven's unfortunate physical and
mental condition she had not been happy in her do-
mestic relations, but such unhappiness was the nat-
ural and necessary result of her mental aberration
that her husband was a philanderer. The record is
absolutely barren of any testimony tending to estab-
lish such misconduct on the part of the contestant.
Appellee makes no contention that it has any founda-
tion in fact. Mrs. Kaven's mental condition was
something more than a mere mistaken notion or con-
clusion as being a wrong deduction drawn from cer-
tain facts or circumstances. It was more than in-

ordinate jealousy. Her persistent habit of talking to strangers and friends alike about misconduct on the part of her husband which had no foundation in fact, as well as her habitual references to his hospital as being a place of ill repute, when the truth was all to the contrary, and her evident total disregard of her husband's feelings or the effect of her false accusations on his professional reputation cannot be accounted for except as being the result of mental derangement. Her otherwise inexplainable act of wholly depriving her husband of any participation in a large amount of property which was accumulated as a result of his own efforts is shown by this record to have resulted from her mental derangement. The cause of Mrs. Kaven's excluding her husband from sharing in her estate is disclosed by the testimony of a disinterested witness:

"At the time of this conversation (1932 or 1933) she spoke about disposing of her property. She said she was going to give the doctor the Forester lot, and that was all she was going to give him on account of him chasing the whores down to the whorehouse. * * * She didn't call it a hospital, but she called it a whorehouse."

We think the record clearly discloses that at the time of making her will Mrs. Kaven was afflicted with an insane delusion which accounts for the terms of her unusual will.

"A person persistently believing supposed facts which have no real existence, against all evidence and probability, and conducting himself upon an assumption of their existence, is, so far as such facts are concerned, under an insane delusion." *Haines* v. *Hayden*, 95 Mich. 332, 354 (35 Am. St. Rep. 566).

"An insane delusion exists when a person persistently believes supposed facts which have no real ex-

istence, and so believes such supposed facts against all evidence and probabilities and without any foundation or reason for the belief, and conducts himself as if such facts actually existed." *In re Barlum's Estate,* 240 Mich. 393.

We are not in accord with appellee's contention that because there is testimony from which it may be inferred that Dr. Kaven had an opportunity to indulge in immoral conduct, if he saw fit, therefore it may be reasonably inferred he was guilty of such misconduct and hence there was some foundation in fact for the erroneous belief of the testatrix. We quote from appellee's brief:

"The nature of his (Dr. Kaven's) work required him to consult with patients privately at his office, hospital or their homes; to answer calls and attend the needs of his patients at any hour of the day and night; to be in attendance at his hospital when needed, whether day or night; to make automobile trips with a nurse. * * * Even these necessary duties to be performed by Dr. Kaven in his profession are in themselves of such a nature as could form the basis for a belief of his unfaithfulness by Mrs. Kaven."

It must be borne in mind that the testimony of the character referred to by appellee is not supplemented by any testimony in this record tending to show that Dr. Kaven ever had any illicit or unduly intimate relations with any of his female patients or employees or any other woman. His opportunities for immoral conduct are not shown to have differed in any way from those of every other physician, and in fact every other man whose business or profession necessitates similar relations with female patients, clients or employees. If, from this record, a court is to hold there was some justification for Mrs. Kaven's belief that because of the noted circum-

stances Dr. Kaven was guilty of illicit relations, then the same inference must be held justifiable as to every physician or other professional or business man surrounded by like circumstances. Such a conclusion is intolerable. It is fully as unjust and illogical as it would be to assume that merely because one is surrounded with opportunities for exercising undue influence, therefore, it is probable undue influence was exercised. We have repeatedly held that such is not the law. *In re Cotcher's Estate,* 274 Mich. 154.

The case will be remanded to the circuit court with directions to vacate the judgment and in lieu thereof enter one in accordance herewith, and for the certification of such judgment to the probate court. Costs to appellant.

FEAD, C. J., and WIEST, BUTZEL, BUSHNELL, SHARPE, POTTER, and CHANDLER, JJ., concurred.