*In re* SOLOMON'S ESTATE.

SOLOMON *v.* BADALAMENTI.

1. Wills — Mental Competency — Evidence — Remission from Pemphigus.

No substantial evidence *held,* to have been adduced to rebut presumption that at the time of making the will testatrix was in full possession of her mental faculties, where it appears will was executed during period of remission between attacks of rare but fatal disease known as pemphigus.

2. Same—Insane Delusions.

An insane delusion invalidating a will exists when a person persistently believes supposed facts which have no real existence, and so believes such supposed facts against all evidence and probabilities and without any foundation or reason for the belief, and conducts himself as if such facts actually existed.

3. Same—Insane Delusions—Evidence.

Capricious and arbitrary dislikes, unjust suspicions against relatives or mistaken beliefs as to their feelings and designs towards a testator and his property, however visionary, or belief of acts or facts which have any evidential basis, do not constitute insane delusions.

4. Same—Insane Delusions—Evidence.

Testatrix who practically disinherited 2 of her 4 children, may not be said to have done so as the result of an insane delusion, where such action was based upon her belief that such children had stolen money from her, a belief which was substantiated by some facts supporting it, even though it may seem illogical and foundationless to the court, since a will should not be overturned merely because the testator has not reasoned correctly.

References for Points in Headnotes

[2–5] 57 Am Jur, Wills § 82 *et seq.*
[2–5] Insane delusion as invalidating will. 175 ALR 882.

5. SAME—INSANE DELUSIONS—BURDEN OF PROOF.

Contestants who seek to defeat a will on ground of insane delusions of testatrix have burden of proving that she believed her statements, had no reasonable information or evidence supporting them and would not have disinherited them but for such belief.

Appeal from Monroe; Golden (Clayton C.), J. Submitted April 15, 1952. (Docket No. 69, Calendar No. 45,436.) Decided June 2, 1952. Rehearing denied September 3, 1952.

Leo Solomon presented the alleged will of Josephine Solomon for probate. Mary Badalamenti and others objected thereto on the ground of mental incompetency of deceased to execute a will. Contest certified to circuit court. Judgment for contestants. Proponent Kelley, executor named in will, appeals. Reversed and remanded for entry of judgment sustaining will and for remand to probate court for further proceedings.

*William J. Mullaney,* for proponents.

*Haas & McCormick,* for contestants.

BUTZEL, J. Josephine Solomon of Monroe, Michigan, testatrix, died March 27, 1950, at the age of 70 or thereabouts. In her will executed on August 15, 1949, she left her daughters Mary Badalamenti and Anna Migliore, contestants, only a nominal bequest of $5 each. She left 2 parcels of property to the local Catholic church; a life estate in 6 houses and lots to her son Jacob with remainder to the Infantile Paralysis Foundation; a life estate in 4 houses, stores and lots, with a frame building at the rear of one location, to her son Leo with remainder to the cardinal of the archdiocese of Michigan, for secular purposes. She left a house and lot with the

furniture and personal effects of her home to a granddaughter.

Upon the will being presented for probate by testatrix's son Leo, the daughter Mary filed objections claiming mental incompetency of testatrix both before and after and at the time of the execution of the will. No claim of undue influence was made. The contest was certified to the circuit court for the county of Monroe where it was heard by the judge without a jury. He made no direct finding as to general incompetency but in disallowing the will he based his opinion upon the ground that during the 6 months preceding August 15, 1949, the date of the will, testatrix had insane delusions in regard to the daughters, whom she practically disinherited. Proponent has appealed.

Testatrix came to this country from Italy at the age of 14 and, after living in Louisiana for a number of years, moved to Monroe, Michigan, with her husband, the father of the 4 children. He died in 1920. By dint of industry, economy and ability, testatrix amassed considerable real estate. For a long period she ran a grocery store. She looked after her home and managed her various properties, acquiring one after another. Her estate was inventoried at about $50,000. Her son Jacob lives in Texas, the other 3 children in Monroe, Michigan. Leo seems to have been close to her as he assisted with the handling of the property, did some painting, minor repairs, et cetera. For a short time he helped run the grocery store and in 1936 testatrix gave him the grocery business, which he ran for a while and later sold, realizing the net sum of $300 from the proceeds of the grocery stock. He did a few odd jobs for others but apparently lived partly on what his mother paid or gave him. The testimony does not indicate the degree of intimacy and affection between the mother and daughters prior to the time when she became

sick. It is quite significant, however, that James Kelley, Sr., attorney for testatrix for many years and who drafted the will in question, testified that at the time it was drawn:

"I did call her attention to the fact that she was leaving practically nothing to the girls and nothing to Jake although when I made a will for her before there was a similarity."

In February, 1949, testatrix became afflicted with a dangerous skin disease, later found to be *pemphigus vulgaris*, which is characterized by numerous large suppurating blisters of the skin and mucous membranes, a sapping of the blood, itching, intense discomfort and pain. The disease usually is fatal although there may be a period of remission as there was in the present case. At this time, testatrix was also suffering from obesity, high blood pressure, and hardening of the arteries. On February 17, 1949, accompanied by 1 of her daughters, testatrix consulted Dr. James, a dermatologist in Toledo, Ohio, who tentatively diagnosed her plight as pemphigus. He testified for contestant, stating that he could not understand testatrix's incoherent statements, even making allowance for her English interspersed with Italian, that she did not have the mental capacity to make a will, that she would neither know what property she possessed, consider and know the natural objects of her bounty, nor understand the disposition thereof she was making in her will. The testimony of what occurred in August completely shows that Dr. James was mistaken in his diagnosis of testatrix's mental capacity during a period of re-mission, for he stated that the disease becomes pro-gressively worse and the patient does not recover his or her mental faculties. He did not see her from February 17, 1949, to February 20, 1950, when she again visited him. Testatrix was dissatisfied with

the prescription Dr. James gave her on her first visit, and threatened to sue him; it was only with the utmost difficulty that her family dissuaded her from her purpose.

Following her first visit to Toledo on February 17, 1949, testatrix went to the Monroe Hospital where the 2 daughters visited her regularly. She constantly complained of the hospital treatment and quarreled violently with one nurse. After consultation by the doctors and at her own request she was transferred by ambulance to the University Hospital at Ann Arbor, Michigan, where Dr. Curtis, the head of the dermatology department, looked after her. She was an extremely difficult patient. Although it was against the precepts of her religion, she asked to be killed. She was in pain, exceedingly unhappy away from home, intractable, uncooperative, and extremely disoriented, although Dr. Curtis could not recall any delusions indicated by her conversation with him. He stated that her physical ailments could result in mental disturbances as she did have such and could easily develop various types of delusions, hallucinations or fixations, and that most fixations of this type are directed against intimate friends, relatives, attorneys, et cetera, and from what he knew March 17, 1949, he felt there was little possibility of her being competent to make an unbaised will the following August. He did state, however, that he did not ever see her again after March 17, 1949, some 5 months before she made her will. One of the daughters testified that when she went to the University Hospital testatrix stated that the hospital staff were trying to kill her and that they were neglecting her. She complained that she had not seen her son Leo. She refused injections and bandages, was belligerent and extremely uncooperative. The daughters had her transferred from a ward to a private room. It was finally arranged to have her

returned on March 17, 1949, to the Monroe Hospital where Dr. Pinkus, a specialist in dermatology, recommended by Dr. Curtis, took charge of her in conjunction with a general practitioner.

Upon her return to the Monroe Hospital she for some time continued similar accusations against the hospital personnel, told her daughter there were "cops" in her room, that people were trying to hit her on the head with a stick, that she was drowning, and that she wanted to use a nonexistent gun in her purse. At one time Dr. Pinkus discussed the possibility of consulting an Italian-speaking psychiatrist with the children. On April 18, 1949, she sent for Mr. Kelley, her attorney, to make arrangements to have money withdrawn from her safety deposit box and placed in her checking account while she was ill in bed. Kelley suggested that the 2 daughters accompany him as witnesses but at first testatrix objected, saying that her daughters did not care for her anyhow and she did not want them to have anything to do with it. She said that she wanted someone to handle her business because she could not trust her children. She accused her daughters of stealing money from her. It appears that Mary during her mother's illness had been handling certain of her mother's finances, using cash found in her possession, withdrawing money from her savings account on signature of testatrix, and at one time, taking money from the safe with permission of testatrix. At one time upon returning from the bank, testatrix accused Mary in front of her sister and brother of always trying to get money from her and that she owed her $300 which she had never returned, that Mary had a private nurse give her an injection so as to make her sign a note to obtain money from a savings bank. Testatrix told Leo that she had told the sisters to hold the $300 and later when she asked for it they refused to return it. Aft-

er these accusations Mary completely stopped handling the affairs of testatrix, although she continued to visit her until she left the Monroe Hospital. Anna thereupon took over the handling of affairs of testatrix until she left the hospital and resumed management of her own affairs. No direct accusations were made by testatrix against Anna, although during the summer months she repeated to Leo that the daughters had stolen $300 from her. Evidently testatrix felt that Mary was primarily responsible but that Anna was also involved. When Leo informed Anna of the accusations in the latter part of July, 1949, Anna stopped any attempt to help her mother.

Testatrix returned to her home the latter part of May, 1949, and resumed a normal life from that time until the early part of 1950. Dr. Pinkus visited her on June 17, 1949, and found her in a good mental condition. Neighbors and women she had in to do her work testified that she was handling her property with her old competence. There is some testimony that she was dissatisfied with her help, alleging that they stole soap and perfume from her, and that she was depressed and in poor spirits most of the time but there is no indication that this impaired her faculties. Significantly, the lady who lived above testatrix's apartment testified that Leo was the one often called when testatrix was ill at night and unable to move around during this period. On September 19, 1949, Dr. Pinkus again visited her and found that a few blisters were reappearing at that time. However, from his limited conversation he felt that her mental condition was still good. Dr. Pinkus stated that although pemphigus eventually is a fatal disease, there may be periods of remission, when blisters dry up and the patient lives a perfectly normal life until the next attack, that from his observation the patient was going through this period of remission. Drs. Curtis and James did not see the

decedent at the time Dr. Pinkus did. It is quite significant that she was able to leave the hospital, return home and tend to her own affairs and did not have occasion to call on Dr. Pinkus again until after the middle of September, 1949. From his testimony, we are inclined to give much credibility to his conclusions. It is true that he stated he had attended only 20 cases of pemphigus during his medical career, but it is shown that it is a rare disease, although its characteristics are well known.

On August 15, 1949, during the period of remission and over 2 months after testatrix left the hospital, she went to Mr. Kelley's office to have a new will drawn. Mr. Kelley had been her attorney for over 20 years, had performed legal services for her at various times including some also after the will was drawn. She had previously spoken to him about making a new will. He was familiar in general with her affairs; she gave him all the data in regard to the provisions of the proposed will and they were carefully discussed. Testatrix stated that she did not want to leave her daughters anything but at Mr. Kelley's suggestion she left them nominal bequests. Mr. Kelley testified that the mental condition of testatrix was very good; she knew exactly what she wanted; she stated that she did not want to leave her daughters anything because they had stolen money from her and had lied to her, and also because she had already given them considerable money. The will states that the sole reason for leaving them only the nominal bequest was that she "had already given them considerable money." After the will was dictated and transcribed Mr. Kelley called in his secretary and in her presence carefully read the will to testatrix before she executed it. Mr. Kelley testified that testatrix discussed the details of the will and that she had an excellent memory, even knowing the street numbers of the many houses she owned with-

out the use of memoranda, which she later consulted to make sure that she was correct.

After testatrix suffered a recurrence of the disease in February, 1950, she again visited Dr. James. He then found her physically and mentally in a very bad condition. She was almost completely irrational. Significantly, she at first put her 2 girls out of her room, but later allowed them to come and see her. They had not visited testatrix since the dispute of the summer before. Anna stated that this was because Leo said that their mother wanted to kill them, or have them arrested because of the alleged theft. There is some testimony also that Leo had told Mary that their mother was satisfied about the $300. She died in Mercy Hospital in Toledo on March 27, 1950.

Although the trial court did not pass on the issue of general mental incompetence, contestants argued that testatrix's general state of mind was such that she was incapable of making a will. A careful examination of the record shows that such conclusion is not warranted about her condition during the period of remission. Upon her return from the hospital in May or June, 1949, she resumed a normal life, handled all of her business affairs, collected her rentals, ran her household without the assistance of her children, despite somewhat understandable fits of depression due to her weakened physical condition. No substantial evidence was adduced to rebut the presumption that at the time of making the will she was in full possession of her mental faculties.

During the direct examination of Mary Badalamenti she was asked by her counsel the leading question of whether her mother had accused her of stealing $3,000 at one time. She replied in the affirmative and stated that her sister and brother and sister-in-law were present. When the other contestant was examined and was asked about being present she made no reference to the amount at issue. The

amount claimed was $300 as shown by all the other testimony even if Mary named the first sum as $3,000 in response to a leading question. Testatrix undoubtedly was convinced that her daughters had stolen or withheld some money from her during the time they handled her affairs while she was in the hospital. Her daughters categorically deny the charge and proponent has no witness or any kind of proof to sustain it. However, the record does indicate a number of transactions involving withdrawals from the savings account, from the safe, and cash moneys. Even with the figures that were brought out at the trial we cannot determine whether $300 was or was not missing. It would take an accounting.

Wide latitude was given by the judge in the taking of the testimony and that of the 2 contestants was received without objection. We have frequently commented on the unsatisfactory nature of testimony of this character. The lips of testatrix are sealed by death so that there is no way of knowing on what she based her conclusion that $300 was missing and that her daughters had taken it. Without testatrix's testimony it was not proven that $300 was taken or was missing but there appear sufficient circumstances so as to show that any such belief of testatrix was not an insane delusion. Testatrix in this regard might have possessed mistaken beliefs but we do not believe they were insane delusions in view of the confused state of her finances during the time she was in the hospital. Again, the claim that testatrix had already given contestants considerable money is denied by them. There was no other proof. Without testatrix's testimony there was no way of rebutting the testimony of contestants given after the death of testatrix. It is quite significant that contestants gave no testimony as to the prior relationship between themselves and testatrix, although it was shown that they lived in the same city for many

years and were on speaking terms. We have heretofore called attention to the fact that testatrix had previously made a will which her attorney said was a "similarity" to the new will. From the very beginning of her illness, testatrix at various times indicated a distrust of her daughters. In view of the distrust, it is not surprising that she drew the conclusion she did.

We have examined the number of decisions cited to us concerning the instant problem. Many, by reason of their facts, are not controlling here. There are, however, certain tests laid down by the decisions which will aid us in reaching a correct result.

We said in *Re Kaven's Estate,* 279 Mich 334 (quoting syllabus 2):

"An insane delusion exists when a person persistently believes supposed facts which have no real existence, and so believes such supposed facts against all evidence and probabilities and without any foundation or reason for the belief, and conducts himself as if such facts actually existed."

What will be considered sufficient foundation or reason for a mistaken belief? In *Re Haslick's Estate,* 195 Mich 432 (Ann Cas 1918D, 466), we said on p 438:

"In considering this question it is to be borne in mind that no capricious or arbitrary dislikes, unjust suspicions or prejudice against relatives, or mistaken beliefs as to their feelings and designs towards him and his property, however visionary, nor belief of acts or facts which have any evidential basis constitute in law insane delusions,"

and cited with approval 1 Underhill on Wills, § 94 (at p 439):

*"If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an in-*

*sane delusion,* though on a consideration of the facts⁷ themselves his belief may *seem* illogical and foundationless to the court; for a will, it is obvious, is not to be overturned merely because the testator has not reasoned correctly." (Italics ours.)

That such facts exist in the instant case cannot be denied.

The lack of information as to the past relations between the contestants and the testator has been a subject of notice by the courts. In *Bean* v. *Bean,* 144 Mich 599, we said (pp 625, 626) :

"I do not understand how it can be determined that the opinion of a father that a son has no regard for him, and is waiting for him to die in order to get a portion of his estate, can be said to have no foundation in fact, and to be the result of insane delusion, except it may be, in cases where relations, induced by a lifetime of dutiful conduct on the one side and of continued and known affection on the other, are suddenly and without known cause interrupted and succeeded by an attitude on the part of the father utterly inconsistent with past conduct."

A review of our numerous past decisions on insane delusions clearly indicates that there must be a great deal of proof that the suspicions or belief of a testator are completely unfounded before they can be held to be an insane delusion. Indeed in the confused financial situation of the testatrix herein, we find some justification for a belief, even though mistaken, and not present in many of the former problems before us. See, for example, *Leffingwell* v. *Bettinghouse,* 151 Mich 513; *In re Doty's Estate,* 212 Mich 346; *In re Barlum's Estate,* 240 Mich 393; *In re Shuler's Estate,* 242 Mich 576; *In re Lacroix's Estate,* 265 Mich 59; and *In re Balk's Estate,* 298 Mich 303, cases where a testator's will was sustained against a claim of insane delusions.

In *Jackson City Bank & Trust Co.* v. *Townley,* 268 Mich 340, it was alleged that the testatrix disinherited her son because she believed her daughter-in-law was immoral and the latter's mother ran a house of ill fame.   Although those were accusations not lightly made, we held at pp 346, 347:

"Contestant had the burden of proving that testatrix believed her statements, *she had no reasonable information or evidence supporting them, and; but for such belief, she would not have disinherited him.*"   (Italics ours.)

The last 2 tests were not met by contestants herein. The will should have been allowed.

Judgment is reversed, with costs to proponent, and the case is remanded to the circuit court to enter judgment sustaining the will and remanding it to the probate court for further proceedings.

NORTH, C. J., and DETHMERS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.