*In re* WALKEY'S ESTATE.

APPEAL OF WALKEY.

1. EVIDENCE—WILLS—OPINION OF PHYSICIAN COMPETENT.
    Testimony of physicians attending testator during latter months of his life and during time when will was executed as to their opinion regarding mental and physical condition of testator, and whether he was mentally competent to make will at time it was made, *held*, competent, relevant, and material.

2. APPEAL AND ERROR—WILLS—EVIDENCE—HARMLESS ERROR.
    Error in rejecting testimony of physicians that in their opinion testator was incompetent to make will was not reversible, where there was positive and uncontradicted testimony clearly establishing testator's competency.

3. WILLS—MENTAL COMPETENCY—DIRECTED VERDICT.
    Where, in will contest case, there was positive and undisputed testimony that testator was competent to execute said will, trial court properly directed verdict in favor of proponents, notwithstanding testimony as to testator's peculiarities and opinion of witnesses that he was incompetent.

4. SAME—SUICIDE NOT PROOF PER SE OF INSANITY.
    Suicide of testator 17 days after making will is not such evidentiary fact as would support verdict and judgment against will on ground of mental incompetency in view of positive and undisputed testimony of competency, since self-destruction is not judicially regarded as proof *per se* of insanity.

Error to Jackson; Parkinson (James A.), J. Submitted January 10, 1930. (Docket No. 75, Calendar No. 34,702.) Decided March 6, 1930.

John A. Dahlem presented for probate the will of Joseph Walkey, deceased. The will was allowed in the probate court, and William Walkey and Char-

As to effect of suicide of testator as evidence of testamentary capacity, see annotation in 24 L. R. A. 577; 27 L. R. A. (N. S.) 94; L. R. A. 1915A, 463.

lotte McGrew appealed to the, circuit court. From a judgment upon directed verdict for proponent, contestants bring error. Affirmed.

· *Nathan E. Bailey,* for proponent Alfreda Brewer.

*Norman E. Leslie,* for proponent Henry Walkey.

*Reuben H. Rossman,* for proponent Salvation Army.

*Frank L. Blackman* and *James Williams,* for contestant William Walkey.

*Bisbee, McKone, Wilson & King,* for contestant Charlotte McGrew.

NORTH, J. Upon trial in the circuit court a verdict was directed sustaining the will of Joseph Walkey, deceased. From the judgment entered, William Walkey and Charlotte McGrew, respectively brother and sister of the deceased, have brought the case to this court by writ of error. The will is assailed on the grounds of mental incapacity and insane delusions. There are 50 assignments of error, but the controversy practically narrows down to two questions: (1) Was there prejudicial error in the ruling of the trial court whereby certain testimony was excluded which the contestants sought to elicit from the doctors who had attended the deceased shortly before his death? (2) Was the trial court in error in directing a verdict sustaining the will?

The will in question was prepared by the deceased's attorney, and signed by the deceased September 9, 1927. It gave to the contestant William Walkey ten dollars, and to the contestant Charlotte McGrew five dollars. A gift of ten dollars was made to a niece, and one of like amount to a nephew;

one-third of the estate was given to Alfreda Brewer, a sister of deceased; one-sixth to the Salvation Army; one-sixth to Henry Walkey, a nephew; and Alfreda Brewer was also made the beneficiary under the residuary clause.

Testator, a bachelor, 17 days after making his will, committed suicide, age 58 years. He had been a hard-working man, a citizen of good standing, and had accumulated his property by his own efforts. His estate inventoried approximately $12,500. He had one brother and two sisters, also nieces and nephews. In recent years he had lived by himself on his farm, a short time with his brother, and at the time of making the will, and for three months prior thereto, with his sister Mrs. McGrew. He then returned to his farm, where he suicided 13 days later. During the latter part of his life he had some prostate gland trouble, and seems to have believed his physical ailment was more serious than it really was. At times he was discourteous to his relatives, unappreciative, unreasonable, irritable, prone to anger, vacillating in his decisions, somewhat slovenly in his personal habits, uncertain and changeable as to the medical or surgical treatment to which he would submit. He habitually conversed about his own physical condition, resorted to indiscriminate remedies, asserted at times, and to some extent contrary to the fact, that his relatives did not come to see him, and at his death he left a note, which was not produced at the trial, but said to have been to the effect that he had been abused by his friends and relatives and ''kicked out'' of his sister's home. This latter assertion was not literally true, although it was made evident to him that his presence there was an unbearable burden on his widowed sister, who was then 74 years of age. About three months before his death he went to Johns Hopkins hospital

for examination and a possible operation, and while on this trip he said and did things which indicated he was then mentally unbalanced. Other details of like character appear in the record.

The trial judge directed a verdict in favor of the proponents because he did not find in the record evidence of insane delusions which affected the provisions of the will, or evidence that tended to sustain contestants' contention that Joseph Walkey was mentally incompetent to make the proffered will on the day of its execution, September 9, 1927.

We must first consider whether there was prejudicial error in the trial court's rulings, which excluded opinion evidence of three doctors who attended Joseph Walkey during the latter months of his life. Objections were sustained to questions which, in part, sought to elicit responses based upon the observations and personal knowledge which the respective witnesses had of the deceased, and in part they were hypothetical questions embodying assumed facts and circumstances which in each instance cover more than two pages of the printed record. Each question called for the opinion of the witness as to the condition of Joseph Walkey on the day of making his will in some one or more of the following particulars: (a) His ability "to transact any business requiring an exercise of the judgment, the reasoning faculties, and a consecutive continuation of thought." (b) Was he "mentally capable without aid or prompting from anyone of recalling and continuously retaining in his mind during the making of said will the number and names of his relatives and the natural objects of his bounty?" (c) Was he "mentally capable without aid or prompting from anyone to keep continuously in his mind while making said will the value, nature, and extent of his property?" and (d) "Was he com-

petent to make such a will'' as the one offered in evidence? Without detailed discussion of the respective questions put to these doctors, it may be said that at least as to some of them the ruling excluding the answer was erroneous. For example, Doctor Townsend knew Joseph Walkey for more than a year prior to his death, for a period of two months he saw the deceased ''on an average of every week or ten days.'' He accompanied him to Baltimore in contemplation of an operation to be performed on Mr. Walkey at the Johns Hopkins hospital; he attended him professionally at least a dozen times after their return, the last occasion being ten days or two weeks prior to Joseph Walkey's death, which was very close to the time the will was made. Doctor Townsend testified that Walkey had suffered from *dementia præcox,* and had delusions. The following question was propounded to the doctor:

''*Q.* Doctor, from your knowledge of Joseph Walkey, in your opinion was Joseph Walkey, in the early afternoon of September 9, 1927, at which time his purported will was made  *  *  *  in a physical and mental condition to transact any business requiring an exercise of the judgment, the reasoning faculties, and a consecutive continuation of thought?''

He was also asked:

''Doctor, assuming that the Michigan law requires that the person who makes a will, at the time of making the will, has such mental faculties and control of the same to the extent of recalling the nature and extent of his property, the number and names of his relatives, the natural objects of his bounty, and the power of retaining such facts while considering his will without suggestions or promptings from anyone, in order to be mentally competent to make a will, from your knowledge of Joseph Wal-

key, and from your professional contacts with him at the time that you treated him and talked with him, is it your opinion that Joseph Walkey was mentally competent on September 9, 1927, that being the date on which he made this will marked Exhibit A, which you have just read, was he competent to make such a will?''

Other questions of like purport were asked of Doctor Townsend and of each of the other two doctors produced by the contestants. The testimony sought was that of the physicians who attended the testator professionally, and it was clearly competent, relevant, and material.

But the controlling issue is this, assuming each of these witnesses had answered in a manner favorable to the contestants, would the record then have presented an issue of fact for the jury rather than one of law for determination by the court. As already noted, the record contains proof of many facts and circumstances indicative of eccentricities and perhaps an abnormal mental condition on the part of the testator. But no one claims he was totally mentally incapacitated. At most, the record sustains only the conclusion that at rather infrequent intervals the testator was seriously disturbed in his mentality, and possibly to the extent that he was not then capable of transacting ordinary business or making a valid will. But no one testified to having seen the testator and that he was in such a condition on the day his will was executed. Instead, the following appears from the record: After having made a will some two or three months earlier, in which the contestant Mrs. McGrew was favorably named, and at whose home the defendant had gone to live at that time, he seems to have been desirous of making a different disposition of his property. He again went to the same attorney, taking with

him the former will. Unassisted by any other person, he outlined in detail the testamentary disposition which he at that time desired to make of his property. He had then determined to leave his sister's home and reside on his own farm. Apparently he decided the provision as to her in his former will should be changed. He was an unmarried man, his father and mother had been dead for years. He had only the one brother and two sisters. As noted, each of these were named in his will, as well as certain of his more distant relatives. When he proposed small gifts to certain relatives, he was advised by his attorney that it was not necessary to name them in his will, but "he insisted on putting everybody in the will." Nothing unnatural or erratic has been pointed out concerning the terms of this will, with a possible exception that he gave only five dollars to Mrs. McGrew, in whose home he had resided without charge for substantially three months, but from which he had already planned to depart. In this connection, it may be noted that Mrs. McGrew owned her own home, and she had a married son and a married daughter who seem fairly well established in life. But the sister whom the will favored, and also her husband, were in ill health, and, to aid in the support of her family, she had taken in washings when she was able to do so.

At the time of making this will, the testator insisted upon the destruction of his former will. He gave to his attorney information from which an accurate list of all his property was prepared and noted upon the cover to the will. He named each of his immediate relatives, all who could possibly claim to be the natural objects of his bounty. This testimony is undisputed, and it quite conclusively establishes that, at the time of the making of this will, Joseph Walkey was possessed of sufficient men-

tality to know and understand the extent of his property, how he wished to dispose of it, who were the natural objects of his bounty, and that he kept these facts in mind to the full extent necessary for the preparation and execution of his will.

The persons who saw him at the time of making the will were the attorney who acted as the scrivener, who had known the testator to some extent for 20 years, and the two subscribing witnesses. Each of these gave positive testimony as to the testamentary capacity of Joseph Walkey at the time this will was executed.

This record also discloses a rather unusual situation, in that Mrs. McGrew, testator's sister and one of the contestants here, and with whom he lived substantially three months next preceding the making of this will, testified in detail as to his conduct and condition during this period, but nothing can be found in her testimony which would justify the inference that the testator was either suffering from insane delusions, or so mentally incapacitated that he could not make a valid testamentary disposition of his property. · The record also discloses, through the testimony of Mr. Trumbull, who for about 15 years had been the secretary-treasurer of the American Building & Loan Association with which Joseph Walkey during that period had an account, that on the day next preceding the date of the will Joseph Walkey was at the place of business of this association and withdrew $500 from his account. Mr. Trumbull, who had known Mr. Walkey for years, talked with him, and concerning him testified:

"*Q.* What did you observe about him as to his mental condition?

"*A*.  Why, I didn't observe; I thought he was —
in fact, it did not enter my mind; he acted the same
as he always did before; only he was not physically
well."

Assuming that the testimony of the doctors would
have been favorable to the contestants and the an-
swers received, we would still have in support of
contestants' case only this opinion evidence supple-
mented by proof of certain facts or statements in-
dicating that the testator possessed the characteris-
tics above noted.  But the positive and undisputed
proof would still stand from which it appears that,
notwithstanding testator's peculiarities and the
opinion of witnesses to the contrary, Joseph Wal-
key, on September 9, 1927, did as a matter of fact
know who were the natural objects of his bounty,
what property he possessed, and the testamentary
disposition he wished to make thereof.  There is no
proof which would justify rejecting this will because
of mental incapacity or on the ground that its terms
were dictated by insane delusions of the testator.
Nor is the subsequent suicide of the testator, under
the record in this case, such an evidentiary fact as
would support a verdict and judgment against the
will.  Self-destruction is not judicially regarded as
proof *per se* of insanity.  28 R. C. L. p. 102.  There
is no claim or proof of either fraud or undue in-
fluence.  Nothing appears on the face of the will in-
dicating a lack of mentality.

This case falls squarely within former decisions
of this court.  See *In re Ferguson's Estate,* 239
Mich. 616; *In re Littlejohn's Estate,* 239 Mich. 630;
*In re Aylward's Estate,* 243 Mich. 9; *In re Lem-
brich's Estate,* 243 Mich. 39, and *In re Spinner's
Estate,* 248 Mich. 263.

The circuit judge was justified in directing a verdict sustaining the will, and the judgment is affirmed.

WIEST, C. J., and BUTZEL, CLARK, POTTER, SHARPE, and FEAD, JJ., concurred. McDONALD, J., did not sit.