APPLEBAUM v. WECHSLER.

1. CONTRACTS—ORAL CONTRACTS TO LEAVE PROPERTY AT PROMISOR'S DEATH—CONSTRUCTION.

Oral contracts to leave to another, upon the promisor's death, the estate of the latter, must be scrutinized closely.

2. SAME—ORAL CONTRACT TO LEAVE PROPERTY AT PROMISOR'S DEATH —EVIDENCE.

An oral contract to leave property to another at the death of the promisor will not be defeated, if genuine, by the informal circumstances of its making; it being necessary to show a meeting of the minds, not a mere intention.

3. SAME—SCRIVENERS—INARTISTIC LANGUAGE.

A contract may be expressed in many ways, ranging from the precision of skilled and suspicious counsel dealing at arm's length, to the inartistic agreements of those in domestic and filial relationship, but the close relationship of the parties will not in itself defeat recovery merely because the agreements of such parties are expressed in the imperfect language of the home rather than the words of the scrivener.

4. SAME—SPECIFIC PERFORMANCE—ESTATES OF DECEDENTS—CARE AND KEEP—EVIDENCE.

Evidence presented in ex-wife's suit against estate of former husband for specific performance of his oral agreement to give her all of his property upon his death in consideration of her caring for and comforting him beginning immediately and

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 57 Am Jur, Wills § 197.
[1, 4] 57 Am Jur, Wills § 201.
[2] 57 Am Jur, Wills § 177.
  Remedies for breach of decedent's agreement to devise, bequeath, or leave property as compensation for services. 69 ALR 14, 106 ALR 742.
[4] 57 Am Jur, Wills § 202.
[5] 28 Am Jur, Insane and Other Incompetent Persons § 56.
[6] 28 Am Jur, Insane and Other Incompetent Persons § 66.
[7] 28 Am Jur, Insane and Other Incompetent Persons § 123.
[8] 28 Am Jur, Insane and Other Incompetent Persons § 139.
[10] 41 Am Jur, Pleading § 3.
[11] 53 Am Jur, Trial § 11.
[12] 41 Am Jur, Pleading § 296.
[13] 41 Am Jur, Pleading § 293.
[14] 49 Am Jur, Statute of Frauds § 19.
[15] 57 Am Jur, Wills § 192.

prior to their contemplated remarriage *held*, sufficient to justify trial court's finding that such contract had been entered into and performed by her.

5. SAME—MENTAL COMPETENCY.

A contract for care and keep that was entered into by a person who lacked ability to understand the nature and effect of what he was doing would lack legal validity.

6. SAME—MENTAL COMPETENCY—EVIDENCE.

Mere enfeeblement by disease, mere age, or mere irrationality on some subjects is not enough to render void a contract by an elderly person for care and keep, it being necessary to show a lack of mental capacity, a lack of ability to comprehend in a reasonable manner, what he is doing with respect to the contract asserted.

7. PLEADING—AFFIRMATIVE DEFENSES—MENTAL COMPETENCY—CONTRACTS—SURPRISE.

The lack of mental capacity to enter into contract asserted in suit for specific performance is an affirmative defense which must be pleaded, as it would come as a surprise to the opposite party (Court Rule No 23, § 3 [1945]).

8. INSANE PERSONS—EVIDENCE—SELF-DESTRUCTION.

Self-destruction is not judicially regarded as proof per se of insanity.

9. SPECIFIC PERFORMANCE—CONTRACT FOR CARE AND KEEP—MENTAL COMPETENCY—PLEADING.

The issue of asserted lack of mental competency to enter into contract with ex-wife for care and keep was not before trial court in suit for specific performance of contract of defendant's decedent, where defendant administrator did not affirmatively plead such defense, hence, there was no error in trial court's refusal to permit the attempted impeachment of plaintiff's witness upon such a collateral issue (Court Rule No 23, § 3 [1945]).

10. PLEADING—PURPOSE.

The purpose of pleading is to give the parties adequate notice of the issues they are to meet (Court Rule No 23, § 3 [1945]).

11. SAME—PRETRIAL HEARING—AMENDMENT.

The pretrial conference is intended to narrow and simplify the issues involved, to consider the necessity of amendments to the pleadings, and, generally, to assure that the issues raised may be expeditiously tried (Court Rule No 35, § 5 [1945]).

12. SAME—AMENDMENT—PRETRIAL HEARING.

Amendment of a pleading should be permitted only under the most compelling circumstances, where sought after pretrial hearing at which disposition of motions to amend should be made (Court Rule No 35, § 5 [1945]).

13. SAME—AMENDMENT—PRETRIAL HEARING—AFFIRMATIVE DEFENSE.

Trial court did not abuse his discretion in denying motion to amend answer to include defense of lack of mental competency on third and last day of trial of suit for specific performance of contract for care and keep of defendant's decedent who is now claimed to have committed suicide, where there had been no amendment sought at time of pretrial conference and pretrial statement made no mention of insanity (Court Rule No 23, § 5 [1945]).

14. FRAUDS, STATUTE OF—CONTRACT BETWEEN DIVORCED PARTIES FOR CARE AND KEEP.

An agreement between divorced parties whereby husband agreed to leave all of his property to his ex-wife in consideration of her caring for and comforting him immediately and prior to their remarriage is not an agreement in consideration of marriage, hence, does not need to be in writing (CL 1948, § 566.132).

15. SAME—ORAL AGREEMENT FOR CARE AND KEEP—PERFORMANCE—DURATION.

Plaintiff, ex-wife of defendant's decedent, who had fully performed her agreement with plaintiff's decedent, her ex-husband, estranged from his children by a former wife, as to caring for and comforting him in return for his promise to leave her all of his property upon his death, was entitled to decree in suit for specific performance, notwithstanding period involved was approximately 2 months and such agreement was not in writing (CL 1948, § 566.132).

Appeal from Wayne; Culehan (Miles N.), J. Submitted October 10, 1957. (Docket No. 41, Calendar No. 47,221.) Decided December 24, 1957.

Bill by Bertha Applebaum against Louis Wechsler, administrator of the estate of Sidney Applebaum, to enforce oral agreement of deceased to leave property to her as sole beneficiary under his will. Decree for plaintiff. Defendant appeals. Affirmed.

*Max E. Klayman* and *George Stone,* for plaintiff.

*Robbins, Wechsler & Lebenbom* (*Arthur L. Robbins,* of counsel), for defendant.

SMITH, J. This case involves a fact situation viewed by courts with suspicion: An asserted oral contract to leave one's property to another at death. The trial chancellor was not insensitive to this breath of hostility ("You cannot," he observed on the first day of trial, "help but view this type of case with a little bit of suspicion at the outset"). Nevertheless he decreed specific performance. The case is before us on a general appeal.

Bertha Applebaum is the plaintiff. She and deceased Sidney Applebaum were married some 22 years prior to his death. Their beginnings were humble. "I come to her with nothing," he is reported to have said. Mrs. Applebaum, in fact, gave him the money for the ring. They lived for a time with relatives. His father-in-law made him a loan, "and then he was in stock buying." Having made a purchase of stock he would take it home in his car. There his wife would help him with it, "you know, to fix it, you know—some buttons to sew; she used to help him right along" and he would then resell. He remained in the business of brokerage of merchandise until his death. So passed the years.

Although there were no children born to this couple, Mr. Applebaum was the father of 2 children by a previous marriage. We cannot avoid some description of the situation with respect to them for it is material to the case. It is clear from the record, and from the findings of the trial court, that his relationship with his daughters was far from close, that, in truth, it was lacking in warmth and affection. One of them testified in the case. She had not known during his lifetime that he had been divorced from his

wife, Bertha. Upon one occasion, bearing a holiday gift for his grandchildren, he was ordered off the premises. The trial chancellor characterized his relationship with the 2 daughters as "cold and distant." We cannot conclude otherwise. Fault therefor we do not assess.

The divorce referred to occurred in May of 1954. In the bill of complaint Mr. Applebaum charged that his wife Bertha had become indifferent to him, and that she did not care to live with him as his wife. The record is not completely clear as to how and why the critical situation had arisen. Certain of the witnesses testified not only that they did not know the reason for the divorce but that Mr. Applebaum had told them that he "didn't know himself." There is, on the other hand, somewhat more than an intimation that it was because of the situation with respect to his children and grandchildren. His children were estranged from him, as we have noted, and he was not permitted to share the lives of his grandchildren. He had wanted children of his own, in fact he had wanted to adopt children, "but it was too late." According to his sister (and his nephew) Mr. Applebaum felt that if he were to divorce his wife Bertha he would then be permitted by his daughters to see the grandchildren. The nephew put it in these terms: "Maybe he thought he could win back his children, his so-called children. I don't know." If, in fact, this was his purpose it was unavailing. After getting the divorce "he went to the daughter, and he said, 'I would like to see the children.' In fact, he left $20 apiece. She said, 'You can't see my children.'"

At any rate, whatever the reasons for the divorce, and these we mention only for the light they may cast upon the controverted question of an asserted meeting of the minds between Sidney Applebaum and his ex-wife with respect to his post-divorce care, it is

clear that, once having obtained the divorce, Mr. Applebaum's unhappiness only increased. (He eventually committed suicide, states the trial chancellor, and although plaintiff asserts this is not properly proved, we will accept it, *arguendo* throughout.) Within a few days he was expressing sorrow over the divorce. He entreated his nephew, Harry Nelson, to intercede for him. "Call up your Aunt Bertha," he asked his nephew. "Call her up and get us back together again. * * * I made a very, very bad mistake. * * * She is the only one that helped me, fed me and took care of me." As a result, arrangements were ultimately made resulting in a reconciliation. He then was, testified Mr. Nelson, "the happiest man in the world." The testimony of his niece, Mrs. Polly Applebaum, was similar. In March of 1955, she testified, he came to her house, "and those are the exact words that he said: 'Mazultov,* Bertha and I are getting married.'" The date of the marriage was not set. As subsequently explained "He wasn't definite; he says within the near future, but there was no definite—he never told me no definite date." As to why he wanted to get remarried, "He was lonesome. He hated to stay by himself in a big flat like that. He had nobody to take care of him. Right after the divorce he used to do his own laundering and cooking. He couldn't do that."

With his factual background we approach the principal issue in the case. The plaintiff contends that she and Sidney Applebaum entered into an oral agreement that in return for her taking care of him, until they remarried, he would leave all his property to her. The trial chancellor so found, in the following terms:

---

* Mazel tov (mazultov), Heb., "Good luck," or "Congratulations."

"That thereafter said Harry (*sic*) Applebaum regretted having obtained the divorce and made persistent efforts to have plaintiff remarry him and that finally on or about the 1st day of March, 1955, the parties agreed to remarry in the near future.

"That thereafter said Sidney C. Applebaum did persuade and implore plaintiff, because he was lonesome and unhappy, to care for him and comfort him as she had done during his marriage to her, and did during the latter part of the month of March, 1955, agree with and promise her that if she would commence immediately, even prior to their forthcoming marriage, to care for and comfort him he would leave all of his property to her and would make a will to such effect. That he also told her he would do this because he felt he had wronged her by the divorce, that she was the only person who was truly interested in his well-being, and that he had long been estranged from his children."

The appellant attacks the decree upon various fronts. It is argued at length that plaintiff did not sustain her burden of proof, specifically that there was no meeting of the minds, that the acts done (by Mrs. Applebaum) in fulfillment of the asserted contract were trivial, and that the whole case is simply "a sordid effort by plaintiff to divert the estate of Sidney Applebaum from his daughters." We agree with the appellant that the law must scrutinize closely and with great caution oral contracts to leave to another, upon the promisor's death, the estate of the latter. There have been, however, many cases involving such agreements and the decisions are clear that the contract will not be defeated, if genuine, by the informal circumstances of its making. What we require is an actual agreement, a contract, a meeting of the minds, not a mere intention. Yet a contract may be expressed in many ways, ranging from the precision of skilled and suspicious counsel dealing at arm's length, to the inartistic agreements of those in

domestic and filial relationship, evidenced not so much by the language of Williston as by opportunities forsaken and devotion bestowed beyond the normal conduct of similar parties so situated. In other words, the close relationship of the parties will not in itself defeat recovery merely because the agreements of such parties are expressd in the imperfect language of the home rather than the words of the scrivener. Such is our problem.

We turn, then, to the testimony presented and the acts of the parties involved. There can be no doubt of certain matters, primarily that Sidney Applebaum was a lonely and distraught man following his divorce. It is clear that he was desirous of remarriage, but it is equally clear that Bertha Applebaum was not willing to agree to an immediate resumption of the marriage relation. She had been divorced by him after many years of life together. Her thoughts we do not know, but her reluctance is understandable. The trial chancellor phrased it well:

"Here the woman gave up her home and left, didn't she? Whether it was disappointment over the divorce or what, she went out from the home when he started the divorce suit. Now why should she rush back into the home just because he changed his mind? Hasn't she a right to contemplate what the circumstances will be? Associate with him and find out? Did they make certain promises to each other? Was she still contemplating going back, and he suddenly died?"

Marriage, then, it would some day be. But Mr. Applebaum was concerned with the present as well as the future. Plaintiff asserts that at this point a solemn agreement was reached with her ex-husband: on her part that she would forthwith take care of him and furnish him companionship, cook his meals (he "hated," we are told, eating in restaurants), do his laundry, accompany him as necessary or desirable,

and he, in turn, would leave everything to her. The agreement, then, in substance and effect, was that in return for her ministrations she would obtain the same economic security in this interim period as she had had in their previous marriage and would, presumably, have after the marriage to come. The agreement so reached was carried out. Bertha, in fact, took care of him. "He didn't move into the same house, did he?" Bertha's sister (with whom Bertha lived subsequent to the divorce) was asked. "No," was the reply, nor did Bertha move out, "but he used to come and spend hours at a time, and eat, and lie down for a nap." She accompanied him to the doctor's office shortly prior to his asserted suicide. The sister's testimony describes the situation in these terms:

"*Q*. Was he a visitor to your home prior to his death?

"*A*. Yes, he was.

"*Q*. How often?

"*A*. He started coming about March, the beginning of March '55, and, as a matter of fact, he was calling up and coming over even before that time, around January, around the first of the year, calling up and talking to my sister, and then around the first of March, approximately that time he became a frequent visitor, daily, twice a day.

"*Q*. Did he have meals at your home?

"*A*. Yes, he did. My sister used to wait on him.

"*Q*. Did you ever talk to Mr. Applebaum?

"*A*. Yes, of course.

"*Q*. Were you present on any occasion during the time you mentioned when they were carrying on conversations between them?

"*A*. Yes. He was saying how happy he was that Bertha consented to see him again, and that they were going to get married, and that she was going to take care of him; and he was just so happy to be in her company, that he needed her so much, he had

been so lonely, he was beginning to realize how lonely he was, and there wasn't anyone else he could turn to for companionship and to take care of him as he had been used to, you know, when they were married."

Illustrative, also, is the testimony of his niece. She asked him one day to dine with her. He refused. Why?

"He said he can't go because he has been eating at Bertha's house at her sister's house at that time, and she has been taking care of him, she has been doing his laundry, as a matter of fact, he has been eating there, they have been going out."

As the chancellor put it, Bertha immediately commenced "to care for and comfort him, that among other things she cooked for him, did his laundry for him, comforted him, accompanied him whenever he so desired, and generally, with her sister and mother with whom she lived, accepted him back as a member of the family."

Defendant points out that this relationship was of relatively short duration, since Sidney's death came on May 3d. This is true, but not controlling of decision. Equity does not count the meals or weigh the laundry. The question at this point is not the quantum of acts performed but the reason for their performance. Was there, in fact, an agreement, pursuant to which these acts were performed, or were they merely gestures of mercy, of kindness to a lonely and distraught old man?

On this question we share the conclusion of the trial chancellor that an agreement had in fact been made. The testimony of the nephew, Harry Nelson, is unequivocal:

"*Q.* How frequently would you say? How frequently did he tell you he visited with her?

"*A.* Oh, I would see him every day. He was the most 'happiest man in the world.' Every day practically. 'She agreed to take care of me.'

"*Q.* Well, about that time did he tell you anything about his relationship with Mrs. Applebaum?

"*A.* Well, he wanted to get married again.

"*Q.* What did he tell you?

"*A.* Well, he approached her and she finally said 'yes'.

"*Q.* Did he tell you when they planned to get married?

"*A.* Yes. Well, it was indefinite. He wanted to get married right away and she wanted to wait but they had an agreement she was going to take care of him and she was going to feed him, and he was the most happiest man in the world, and he told me he did her a great injustice by what he did. * * *

"*Q.* And when he said he did her an injustice, was that also again when they were going together again?

"*A.* Yes. But he says he is going to absolutely take care of her, 'everything belongs to her.' In fact, he was ready and she didn't want it yet. He says, 'I am going to take care of her the rest of her life,' and he made the promise.

"*Q.* Did he offer to do anything for her?

"*A.* All the time from there on in. He bought a new car.

"*Q.* What did he say he wanted to do for her?

"*A.* He wanted to take care of her the rest of his life. He felt if anybody had it coming, she did.

"*Q.* Had what coming?

"*A.* Everything he had. He said she was the only one that actually took care of him.

"*Q.* What was 'everything?' You mentioned everything that he had.

"*A.* Everything, all of his belongings, his house, money, his bonds. He said he did her a great injustice, and he was mad because she never raised her voice; she was so futile and everything else, she never raised her voice.

"*Q.* Did he tell you what he was going to do with his property?

"*A.* Yes.

"*Q.* What was that?

"*A.* He said that it belongs to her without a doubt. I didn't mention it once but he always mentioned it, the fact, every time I seen him and I seen him every day."

The above testimony does not stand alone. Equally clear is the testimony of Mrs. Annette Walfish, Bertha's sister, at whose home she lived following the divorce:

"*Q.* Did he ever discuss their married plans in your presence?

"*A.* Yes, he did. She agreed to marry him, only she wanted to wait a while, and then he said she had agreed to take care of him, and he was going to leave —that he had no one else in the world to leave any of his estate to, and he was going to leave everything —everything would belong to her.   *   *   *

"*Q.* You mentioned something about him going to leave his worldly goods to her. Did he tell you that, or were you just referring to the conversation between them?

"*A.* I overheard it.

"*Q.* Were you present in the room?

"*A.* Yes.

"*Q.* Can you tell me anything else that might have been said in that connection at that particular time?

"*A.* He just said there was no one else that he would leave anything to, there was no one else that he had that would be entitled to anything, and she had taken such good care of him all through the years, and now she had agreed to take care of him again and minister to his needs and keep him company, and that is why he was going to leave it to her."

Upon this record the trial chancellor was amply justified in finding that Sidney Applebaum entered

"into a verbal agreement with plaintiff to give all of his property to her upon his death in consideration of her caring for and comforting him beginning immediately and prior to their contemplated marriage."

Error is assigned also upon the refusal of the trial chancellor to admit testimony as to the mental capacity of Sidney Applebaum. We have noted heretofore that the fact of his suicide was accepted by the trial chancellor although plaintiff insists that there was no competent proof of suicide in the record. The court's position was that such circumstance, in itself, was immaterial to the issue before him, namely, whether or not a contract had been entered into. "It is not," said the chancellor at one point "an insurance case. There is no double indemnity involved here. It is a lawsuit between alleged heirs." And, at another point:

"Let us assume for the purpose of argument that he did commit suicide, does that make any difference whether his daughters inherit or whether his wife inherits or anybody else? I don't see that it does, and that is the issue in this case; who gets the $35,000 in assets in this man's estate."

The issue sought to be raised by defendant is one of contractual capacity (*i.e.*, "whether this man had the mental faculty that would be required of an individual to enter into a contract for the disposition of his estate"). If in fact the mental condition of the deceased at the time of his entry into the contract alleged was such that he lacked the ability to understand the nature and effect of what he was doing the act would lack legal validity. It is not, however, enough for invalidity that one be enfeebled by disease, be old, or indeed be irrational on some subjects. He must, in order to have invalidity as a result of lack of mental capacity, lack the ability to comprehend, in a reasonable manner, what he is doing with

respect to the contract asserted. Must such lack of capacity be pleaded as an affirmative defense? Court Rule No 23, § 3 (1945) provides as follows:

"Sec. 3. The facts constituting any affirmative defense, such as payment, release, satisfaction, discharge, license, fraud, duress, estoppel, statute of fraud, statute of limitations, illegality, that an instrument or transaction is either void or voidable in point of law, or cannot be recovered upon by reason of any statute or by reason of nondelivery, want or failure of consideration in whole or in part, and any defense which by other affirmative matter seeks to avoid the legal effect of or defeat the cause of action set forth in the plaintiff's declaration or bill of complaint, in whole or in part, and any ground of defense which, if not raised on the pleading, would be likely to take the opposite party by surprise, must be plainly set forth in the defendant's answer."

In construing the above language it is pertinent to observe that if a contracting party lacks, in fact, the mental capacity to reach an agreement, any "contract" entered into by him would be utterly nugatory upon elementary principles. More accurately speaking, there would be no contract. The transaction would be void "in point of law." Moreover, the assertion of such a defense, not pleaded, would come as a surprise to an opposite party. Even conceding self-destruction, this circumstance is not judicially regarded as proof per se of insanity. *In re Walkey's Estate*, 249 Mich 653. The proof of insanity (or the rebuttal of such proof) normally requires testimony of a technical nature not utilized in the course of an ordinary trial. It must, then, be affirmatively pleaded under Court Rule No 23, § 3 (1945). Such was not here done and under these circumstances the trial chancellor was correct in his ruling that the asserted lack of mental capacity was not an issue before him. Thus we find no error in his refusal to

permit the attempted impeachment of witness Nelson upon the collateral issue, nor, we will add, do we find any undue restriction imposed by the trial court in the examination of this witness.

Defendant took the double-barreled position, (a) that insanity was not an affirmative defense, and (b) that "in any event, if necessary, an amendment to defendant's answer should have been granted by the trial court." We have recently had occasion to consider the matter of pleadings and amendments thereto. *Manley, Bennett & Company* v. *Woodhams,* 349 Mich 586. Without attempting to summarize all that was said therein we will here point out merely that the purpose of modern pleading is to give the parties adequate notice of the issues they are to meet. The pretrial conference* is intended to narrow and simplify such issues, to consider the necessity of amendments to the pleadings, and, generally speaking, to assure that the issues raised may be expeditiously tried. Its purpose is to achieve rapid and efficient administration of justice by eliminating traps and surprises. This is not to say that amendments to the pleadings may never be made subsequent to pretrial. As we held in *Simonelli* v. *Cassidy,* 336 Mich 635, 640: "While the right to amend for good and sufficient reason, in the discretion of the trial court, exists after the pretrial hearing, nevertheless in the orderly administration of justice, such amendments should be permitted only under the most compelling circumstances." In the case now before us we note from the calendar that it had been commenced well over a year prior to trial; we observe from the original record that the pretrial statement makes no mention of insanity, and we find that the matter of the amendment itself was not brought up until the third and last day of trial. Under these

---

* See Court Rule No 35, § 5 (1945).—Reporter.

circumstances we will not interfere with the discretion exercised by the trial chancellor.

There is no merit in the statute of frauds issues. This is not an agreement in consideration of marriage* (37 CJS, Frauds, Statute of, § 5), and, moreover, there was full performance on plaintiff's part, *Bassett* v. *American Baptist Publication Society*, 215 Mich 126 (15 ALR 213), the duration thereof being immaterial, *Denevan* v. *Belter*, 232 Mich 664.

Affirmed. Costs to appellee.

DETHMERS, C. J., and SHARPE, EDWARDS, VOELKER, KELLY, CARR, and BLACK, JJ., concurred.

---

* See CL 1948, § 566.132 (Stat Ann 1953 Rev § 26.922).—REPORTER.