TEASON *v.* MILES.

1. SPECIFIC PERFORMANCE—ORAL CONTRACT TO CONVEY LAND BY WILL
—EVIDENCE—BURDEN OF PROOF.

Equity's power to grant specific performance of an oral contract
to convey land by will, so as to prevent posthumous escape
from obligations assumed thereunder is exercised to prevent
fraud upon the survivor otherwise denied his matured expect-
ancy after a lifetime of contracted performance, the correlative
duty to prevent fraud upon the estate of the deceased party
to the agreement being met by the imposition of a heavy
burden of proof upon the proponent and the view with great
caution of the testimony of witnesses so as to detect the
difference between a binding contract and a mere expression
of intention, the acts of the parties looming large as compared
with what the witnesses say they said.

2. SAME—ORAL CONTRACT TO CONVEY LAND BY WILL—PART PERFORM-
ANCE.

An oral contract to convey land by will must be mutual and the
tie reciprocal, it must be certain in all particulars, and there
must be acts of part performance, unequivocally referring to
and resulting from the agreement, in order to be specifically
enforced.

3. SAME—ORAL CONTRACT TO CONVEY LAND BY WILL.

An oral contract to convey land by will may not be defeated, if
found to be genuine in a suit for specific performance, by the
informal circumstances of its making.

4. SAME—ORAL CONTRACT TO CONVEY LAND BY WILL—EVIDENCE.

Evidence presented in son's suit for specific performance of

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 57 Am Jur, Wills § 192 *et seq.*
Decedent's agreement to devise, bequeath, or leave property as
compensation for services. 69 ALR 14, 106 ALR 742.
[3] 57 Am Jur, Wills § 167.
[4] 57 Am Jur, Wills § 185 *et seq.*

mother's oral contract to convey 40 acres of her land to him
by will in return for his agreement to take care of her during
her remaining years *held*, sufficient to justify trial court's find-
ing of such agreement, especially where it included an un-
delivered letter to an attorney directing him to prepare a will
in fulfillment of such contract and other son who opposed
plaintiff had made his home out of the State while plaintiff
took care of their mother for 13 years.

Appeal from Allegan; Smith (Raymond L.), J.
Submitted October 2, 1962. (Docket No. 9, Calendar
No. 49,591.) Decided December 4, 1962.

Bill by Earl Teason against Fred T. Miles, ad-
ministrator of the estate of Lottie B. Teason, de-
ceased, Edwin E. Teason and Ranghild Teason for
specific performance of verbal contract to make a
will. Decree for plaintiff. Defendants Edwin E.
Teason and Ranghild Teason appeal. Affirmed.

*Rex W. Orton,* for plaintiff.

*Ten Cate, Townsend & Cunningham,* for defend-
ants Teason.

SOURIS, J. Upon his mother's death intestate,
plaintiff Earl Teason sought equity's aid to obtain
for himself the north 40 acres of his mother's 68-acre
farm. Opposing his claim is his brother, defendant
Edwin Teason, with whom plaintiff would otherwise
share the farm, appraised for probate purposes at
$8,000. The north 40 acres contained the farmhouse,
barn and other buildings and part of the land had
been farmed by plaintiff. The remaining 28 acres
of the farm were located across a public highway
and had not been cultivated during their ownership
by Mrs. Teason.

Plaintiff bases his claim to the north 40 acres upon
an alleged agreement with his widowed mother

whereby he agreed to remain on the farm and to care for her during her lifetime in exchange for which she agreed to leave him by will the north 40 acres of the farm. Like most such agreements, this one was oral and, as far as is disclosed by the record, was not formally entered into in the presence of witnesses, nor was it ever subsequently affirmed by either party in the presence of the other party to the agreement and in the presence of others. In support of his claim, plaintiff relied upon proof of the services he rendered to his mother during her lifetime, statements made by her to others from which a fair inference of such asserted agreement could be drawn and an undelivered letter in the mother's handwriting addressed to an attorney in which she expressed a desire for the preparation of a will which would have implemented such an agreement.

The powers of equity regularly are invoked to prevent posthumous escape from the obligations assumed by such agreements. It is said that equity's power is exercised to prevent fraud upon the survivor denied his matured expectancy after a lifetime of contracted performance. Equity's power in such cases has been examined recently in *Hammel* v. *Foor,* 359 Mich 392, 398, 399, and earlier in *Woods* v. *Johnson,* 266 Mich 172, 175.

But our concern to prevent such fraud upon the survivor is matched by our concern to preclude the use of equity to perpetrate fraud upon the estate of the deceased party to such an agreement. While we concede that proof of such an agreement, if performed by one of the parties, may rest on parol evidence, we impose a heavy burden of proof upon its proponent. *Hammel* v. *Foor, supra,* and cases cited therein at p 398. Mr. Justice Fead, in *Paris* v. *Scott,* 267 Mich 400, 403, 404, expressed the Court's concern thus:

"In cases of this kind, the testimony of witnesses must be viewed with great caution, because of the frailties of memory, the improbability of repeating the precise language of a person since deceased, of fairly expressing the full state of mind of such person, and because the change of a word may mean the difference between a binding contract and a mere expression of intention. Care must also be taken lest the court, out of considerations of equity or sympathy, make a contract for the parties where none existed, even though such contract might or would express their desires. Where the alleged contracting parties cannot testify, their acts loom large as compared with what witnesses say they said."

Earlier in the same year, in *Woods* v. *Johnson,* *supra,* at pp 174, 175 (quoted with approval in *Blackwell* v. *Keys,* 353 Mich 212, 217), Mr. Justice POTTER described the elements of proof essential to invocation of equity's aid:

"The contract or agreement sought to be enforced must be mutual and the tie reciprocal. It must be certain in all essential particulars. There must be acts of part performance, unequivocally referring to and resulting from the agreement."

What has been said concerning the proponent's heavy burden in such cases, however, must be applied, not abstractly as hypothetical propositions of evidentiary law, but in the context of the circumstances of diminishing life which gave rise to the need for such contractual arrangements in the first place and in the subsequent context of the circumstances of their partial performance before death. While acknowledging our continuing insistence upon clear and convincing proof of an agreement, this Court speaking through Mr. Justice TALBOT SMITH in *Applebaum* v. *Wechsler,* 350 Mich 636, 642, 643, expressed our frame of reference this way:

"We agree with the appellant that the law must scrutinize closely and with great caution oral contracts to leave to another, upon the promisor's death, the estate of the latter. There have been, however, many cases involving such agreements and the decisions are clear that the contract will not be defeated, if genuine, by the informal circumstances of its making. What we require is an actual agreement, a contract, a meeting of the minds, not a mere intention. Yet a contract may be expressed in many ways, ranging from the precision of skilled and suspicious counsel dealing at arm's length, to the inartistic agreements of those in domestic and filial relationship, evidenced not so much by the language of Williston as by opportunities forsaken and devotion bestowèd beyond the normal conduct of similar parties so situated. In other words, the close relationship of the parties will not in itself defeat recovery merely because the agreements of such parties are expressed in the imperfect language of the home rather than the words of the scrivener. Such is our problem."

And such is the problem at hand. No scrivener was called to the Teason farm to reduce the agreement of mother and son to writing, nor did they themselves summarize its terms in a writing of any kind at the time. The chancellor found from the evidence presented that after plaintiff's father died, in 1949, plaintiff continued to work the farm and to maintain outside employment as well. Although he paid no room and board, and kept whatever profit there was from the farm,* he kept up the farm buildings, improved the home, purchased most of the groceries and paid most of the other expenses of his and his mother's existence from his own income. Mrs. Teason's sole income was between $58 and $63 per month from social security benefits.

---

* He testified, "I practically lost on them [crops] because I mean I did not have enough acreage and I [took my losses as deductions on] my income tax."

From neighbors and from a sister, sister-in-law and a cousin of decedent, testifying for plaintiff, it appears that Mrs. Teason frequently expressed her gratitude for plaintiff's having remained on the farm with her: "I would certainly have to leave if Earl wasn't here. There is no one else I could call in for help." She also told several of the witnesses that plaintiff had promised to care for her until her death and that he was to get the north 40 acres of the farm upon her death. During a conversation with her sister-in-law concerning distribution of her property, in which Mrs. Teason mentioned that plaintiff was to have the property on the north side of the road, she told her sister-in-law how well she was being cared for by plaintiff and added, "I want to do what is right in return."

None of the witnesses testified directly that Mrs. Teason ever mentioned a specific agreement such as is claimed by plaintiff. However, there was competent testimony that plaintiff had promised to remain with and care for his mother during the balance of her life; that the mother wanted him to have the north 40 acres and had told him he would get that part of the farm upon her death; and that plaintiff had, in fact, remained with and cared for his mother until she died. In addition, after the mother's death, an undelivered letter was found in her effects addressed to a local attorney in which she directed him to draw a will leaving the north 40 acres to plaintiff and the balance to her other son, defendant herein, and ended with these significant words: "and Earl should take care of me to my death."

The testimonal record, supported as it is by the mother's own handwritten expression of testimonial intent, takes this case one step beyond proof of the "mere intention" referred to in *Applebaum*. From the facts which were proved,—plaintiff's promise and performance, his mother's gratitude therefor ex-

pressed to others, her intention to repay by devise communicated to plaintiff, and her own memorandum of testimonial intent confirming the asserted agreement,—all fairly support the chancellor's finding that the agreement did exist, was fully performed by plaintiff and should now not be defeated by equity's failure to act.

Further support for the chancellor's ruling may be found in the striking differences in Mrs. Teason's relationships with her 2 sons, the contestants here. One, plaintiff, lived with and cared for her during the last 13 years of her life; the other, defendant, made his home in Illinois. The agreement found by the chancellor, favoring the son who contributed most to his mother's comfort in her last years, is not at all inconsistent with the relationships between the sons and their mother disclosed by this record.

Affirmed. Costs to appellee.

CARR, C. J., and DETHMERS, KELLY, BLACK, KAVANAGH, OTIS M. SMITH, and ADAMS, JJ., concurred.

