ANDERSON *v.* BOULIS

1. CONTRACTS—MENTAL COMPETENCY—EVIDENCE.
    Mere enfeeblement by disease, mere age, or mere irrationality
    on some subjects is not enough to render void a contract by
    an elderly person for care and keep, it being necessary to
    show a lack of mental capacity, a lack of ability to comprehend
    in a reasonable manner, what he is doing with respect to the
    contract asserted.

2. POWERS—POWER OF ATTORNEY—FIDUCIARY RELATIONSHIP—AC-
    COUNTABILITY—BURDEN OF PERSUASION.
    A person who obtains money from the bank account of another
    pursuant to a power of attorney is a fiduciary of the grantor
    of the power, and he must bear the burden of showing that he
    has a right to the money in question before it can be retained
    by him.

Appeal from Gratiot, Corkin (Leo W.), J. Submitted Division 3 January 7, 1969, at Grand Rapids. (Docket No. 4,203.) Decided January 28, 1969.

Complaint by Mabelle Anderson, for herself, and as administratrix of the estate of Shem Rhynard, deceased, against Marion Boulis and Helen D. Boulis, to set aside a deed from Shem Rhynard to defendants. Judgment for defendants. Plaintiff appeals. Modified and affirmed.

*Ralph B. Hoschner,* for plaintiff.

*Fortino, Plaxton, & Moskal,* for defendants.

REFERENCES FOR POINTS IN HEADNOTES
[1]  17 Am Jur 2d, Contracts §§ 16, 17.
[2]  3 Am Jur 2d, Agency §§ 23, 24, 28–33.

PER CURIAM. The following opinion was rendered by the trial judge:

"This is an action to set aside a conveyance from Shem Rhynard and Lorena Rhynard, husband and wife, both now deceased, to Marion Boulis and Helen D. Boulis, husband and wife, defendants.

"The plaintiffs Harry John Fisher and Thomas Edward Fisher are grandsons of Shem and Lorena Rhynard, and the plaintiff Mabelle Anderson was the daughter and sole heir at law of the Rhynards.

"The defendant Marion Boulis was a nephew of Shem and Lorena Rhynard who lived with them for 5 or 6 years prior to his marriage and had worked the farm in question as a tenant for several years prior to the Rhynards death.

"Shem Rhynard survived his wife, and the plaintiff Mabelle Anderson was administratrix of his estate, and as sole heir at law inherited all of the personal estate in the amount of approximately $15,000. Thus, this is not a case where the heirs were cut off entirely as a result of the conveyance of the farm in question to the defendants.

"At the close of plaintiff's proofs the court ruled that there was not sufficient evidence to support a claim for rescission because of undue influence, fraud or misrepresentation on the part of the defendants. Also, that there was no evidence that defendants had misappropriated any stock to their own use. The court also dismissed Harry John Fisher and Thomas Edward Fisher as parties plaintiff because they were not heirs at law, and there was insufficient proof of any contract or agreement between them and Shem and Lorena Rhynard whereby they would become possessed of the farm, by will or otherwise, on the death of the survivor of Shem and Lorena Rhynard.

"Thus the court is presented with the question of whether the deed to the Rhynard farm coupled with the support agreement should be set aside because of the incompetency of the grantors.

"The deed to the defendants was executed November 6, 1964, and at the same time an agreement to support was entered into between the Rhynards and the defendants and what might be characterized as a general power of attorney was granted to Marion Boulis by the Rhynards. The deed retained a life estate to the grantors.

"The Rhynards had owned and occupied the farm for many years. The house was in a poor state of repair and was not serviced by electricity or telephone.

"For several years the grandsons Harry and Thomas Fisher had lived with their grandparents. Thomas Fisher was in the armed services from January 28, 1959 to January 28, 1963, and returned to the Rhynards following his discharge. However, in September, 1963 he married and left the household. Harry Fisher was still living with his grandparents when they went to live with the defendants.

"So far as operating the farm was concerned, Marion Boulis had leased the land from 1957 or 1958, with the Rhynards continuing to occupy the house.

"Probably, as early as 1962 it became apparent that the Rhynards were in failing health. Testimony would indicate that Shem's hearing and eyesight were failing and greatly impaired and that on occasion his mind would wander. Mrs. Rhynard apparently retained her faculties into 1964.

"Dr. William Bearndt who had treated the Rhynards since 1956 and last saw them September 15, 1964, testified that in his opinion Shem became senile in 1963–1964. Both Rhynards were suffering in varying degrees from arteriosclerosis affecting the brain in the case of Shem and the heart in the case of Lorena. The doctor was of the opinion that they were in no position to look after themselves, and tried to influence them into going to a nursing home. They did not buy the nursing home idea.

"Apparently Mr. Rhynard broke his hip in late 1963 or 1964 and was confined to a nursing home for a few weeks, and he was again confined in the nursing home in late 1963 or 1964 for a few weeks.

"It became apparent to various grandchildren and Mrs. Anderson in the late summer or early fall of 1964 that the Rhynards could not continue to live in their home without someone to look after them, more or less constantly. Apparently they would not consider a nursing home, and no one could be found to come and live with them.

"It was finally decided that the best solution would be for the Rhynards to move into an apartment in Ashley where their meals could be provided and better supervision of their welfare could be had. The testimony would indicate that Mrs. Rhynard was amenable to the plan but that Mr. Rhynard objected.

"The matter came to a head on or about November 1, 1964, when Harry Fisher informed the Rhynards that things could not continue as they were and that it was time to move to the apartment in Ashley. A quarrel ensued and Harry told them that if they would not comply proceedings would be instituted to have them committed to a rest home. This was apparently only intended as a threat.

"On November 4, 1964, the Rhynards went to live at the home of the defendants.

"The testimony shows that early in October, 1964 Shem Rhynard proposed the arrangement that was finally consummated with Marion Boulis. The defendants discussed it between themselves for several days, and a few days prior to November 4, 1964, a second conversation was had and the defendants accepted the proposition.

"On arrival at the Boulis home Mr. Rhynard instructed Mr. Boulis to contact Mr. Jack Arnold, an attorney in Ithaca, Michigan, and have him prepare the necessary papers. Mr. Boulis did not know Mr. Arnold.

"Mr. Arnold went to the Boulis home and talked with the Rhynards about 6 p.m. on November 4, 1964. The defendants were not present at this interview.

"Mr. Arnold testified that he discussed the proposed arrangement with the Rhynards at great length. Following this interview he returned to Ithaca and within the next day or so prepared the deed, support agreement and power of attorney. On November 6th he returned to the Boulis house with the papers, taking with him a Mr. John Hodges, a mature disinterested witness. Again Mr. Arnold reviewed the proposed arrangement privately with the Rhynards and at some length. Satisfied that the Rhynards were fully cognizant of what they were doing Mr. Arnold had the document executed.

"Mr. Arnold testified that during his talks with the Rhynards they told him what they wanted in the support agreement; knew the extent of their property, its nature and where located; knew the name and residence of their daughter and that she would inherit the balance of their estate; the extent and location of their various bank accounts; Shem knew the description of the real estate without reference to any documents; knew of the recent death of Mr. Arnold's father; knew that the farm adjoining theirs had recently been sold and the purchase price; and was aware of minor matters of local interest.

"There was ample evidence to show that Shem Rhynard had a good understanding of the approximate value of his farm.

"On November 5, 1964, Mrs. Rhynard wrote the following letter to her daughter Mabelle Anderson:

> "'Ashley Mich or
> North star it is now
> Nov 5 – 64

" 'Dear Mabelle Ill write and tell where we are since yesterday we are at Marions he was the only one that wanted us as I got down and out the Dr.

Shellene said I would have to go to a hospital as I wasn't able to do nothing so Marion said to come over here so here we are dont have to do nothing only take my medicine sleep when I want to so come to Marions sunday when you come up the rest didnt want us so here we are the Dr is coming to see me tonight this is all for this time  Mother.'

"This letter was properly addressed, was written in longhand, and is very legible.

"There is no question but what the defendants carried out their share of the bargain, and no complaints were heard relative to the care they gave the Rhynards.

"Mrs. Rhynard died in December, 1964 and Mr. Rhynard died May 4, 1965.

"At the time the documents were executed Shem Rhynard was 91 and Lorena Rhynard was 78, and there is no doubt that they were infirm in body and mind; Shem to a greater degree.

"In *Applebaum* v. *Wechsler* (1957), 350 Mich 636, at p 648 is found the following statement:

" 'The issue sought to be raised by defendant is one of contractual capacity (*i.e.*, "whether this man had the mental faculty that would be required of an individual to enter into a contract for the disposition of his estate"). If in fact the mental condition of the deceased at the time of his entry into the contract alleged was such that he lacked the ability to understand the nature and effect of what he was doing the act would lack legal validity. It is not, however, enough for invalidity that one be enfeebled by disease, be old, or indeed be irrational on some subjects. He must, in order to have invalidity as a result of lack of mental capacity, lack the ability to comprehend, in a reasonable manner, what he is doing with respect to the contract asserted.'

"This is apparently the rule in Michigan, for determining the requisite mental capacity to contract. In the opinion of the court the Rhynards

did understand the nature and effect of what they were doing and comprehended in a reasonable manner what they were doing.

"Blessed with hindsight, it can now be argued that the Rhynards might have adopted some different course of action that would have been less costly, but this is not evidence of mental incompetency. Actually, faced as they were with the choice of the apartment in Ashley or a nursing home, both of which were repugnant, and with no close relative volunteering care and support, it is quite understandable that they entered into the agreement with defendants.

"The plaintiff argues that Marion Boulis occupied a confidential or fiduciary relationship to the Rhynards and that the burden was on the defendants to prove the fairness of the transaction and that there was no overreaching.

"In the opinion of the court any fiduciary relationship Marion Boulis might have had to the Rhynards was more technical than real. The entering into the agreement and execution of the documents was as much an arm's-length transaction as could reasonably be expected under the circumstances. When the agreement was made no one knew how long the Rhynards would live or what care or expense would be required. On the basis of the facts in this case known to exist at the time of the agreement, the court would not consider it injust or unconscionable.

"A judgment may enter dismissing plaintiff's complaint, dissolving the injunction heretofore issued, and requiring Harry John Fisher to pay defendants rent at the rate of $20 per month from May 5, 1965, to the date of judgment or such shorter period as he may have occupied the premises. Costs to be taxed defendants."

The opinion properly states the applicable law. The trial judge had the benefit of observing the witnesses and weighing their credibility. We conclude

from our examination of the record that the findings of the trial judge are not clearly erroneous.

One issue in the case was not determined by the trial judge. The issue concerns the sum of $1,533.17 obtained by the defendants from the bank account of Shem Rhynard during his lifetime, pursuant to the power of attorney mentioned in the foregoing opinion. We find as to this issue that the defendants were in a fiduciary relationship with Mr. Rhynard at the time they received this sum of money. We find, from a review of the evidence, that the defendants have failed to sustain their burden of proof that the money should be retained by them. The judgment should be modified to require defendants to pay the $1,533.17 to the Rhynard estate.

Affirmed, except as modified. No costs, neither party prevailing fully.

LEVIN, P. J., and HOLBROOK and DANHOF, JJ., concurred.